## TEXAS COCA-COLA BOTTLING CO. v. LOVEJOY.

### No. 1971.

Court of Civil Appeals of Texas. Eastland.

March 1, 1940.

Rehearing Denied March 29, 1940.

Wagstaff, Harwell, Wagstaff & Douthit, of Abilene, and Thos. R. Smith, of Colorado City, for appellant.

Beall, Beall & Yonge, of Sweetwater, and Chas. C. Thompson, of Colorado City, for appellee.

GRISSOM, Justice.

R. B. Lovejoy instituted this suit against Texas Coca-Cola Bottling Company to recover damages alleged to have been sustained as the result of his wife drinking glass from a bottle of coca-cola bottled by the defendant.

This is the second appeal of this case. The opinion on the former appeal may be found in Tex.Civ.App., 112 S.W.2d 203.

In answer to special issues submitted the jury found (1) that the bottle of coca-cola from which Mrs. Lovejoy drank contained particles of broken glass. (2) That Mrs. Lovejoy swallowed particles of broken glass in drinking said bottle of coca-cola; (3) that Mrs. Lovejoy was injured as a result of swallowing glass contained in said bottle of coca-cola. (4) That the defendant delivered the bottle of coca-cola from which Mrs. Lovejoy drank the glass to Hicks Rubber Company; (5) that the glass was in the bottle at the time it was so delivered; (6) that the defendant was negligent in delivering the bottle of coca-cola with glass in it; (7) that such negligence of the defendant was a proximate cause of the injury sustained by Mrs. Lovejoy. (8) That the bottle of coca-cola from which Mrs. Lovejoy drank contained particles of broken glass when it left defendant's bottling plant; (9) that the defendant failed to discover such broken glass in the bottle of coca-cola before permitting it to leave its bottling plant; (10) that such failure was negligence; (11) that such negligence was a proximate cause of Mrs. Lovejoy's injuries; (12) that $15,000 if paid now in cash would adequately reimburse plaintiff for the injuries sustained as the result of swallowing glass from the bottle of coca-cola. (13) That it was necessary for plaintiff to incur doctor's hospital and medical bills as the result of injuries so sus-

tained; (14) that $125 would reimburse plaintiff for reasonable doctor's hospital and medical bills incurred as a result of such injuries. (15) That the physical suffering of Mrs. Lovejoy since October, 1934, is not due solely to a diseased condition of her body in no way connected with swallowing glass. The court rendered judgment upon said verdict for the plaintiff for the sum of $15,125. The defendant has appealed.

By its fourth and fifth assignments of error, defendant contends the judgment should be reversed because defendant's witness, Mrs. Selby, on cross examination, testified that she thought Mr. Merrill was in the insurance business. Defendant con-. tends that such testimony informed, or was calculated to impress the jury with the view, that defendant carried indemnity insurance, and that any judgment rendered would be paid by the defendant's insurance carrier, and, therefore, the trial court erred in not declaring a mistrial and discharging the jury. The situation surrounding the introduction of said testimony and the action of the court and counsel relative thereto are disclosed by the statement of facts as follows:

"Who was it first talked to you about this case? A. I don't know.

"Q. Nobody ever has talked to you about it? A. No, nobody has told me what to say.

"Q. I want to know—

"Mr. Harwell: We admit we had the witnesses gathered, your honor.

"Mr. Beall: I want to know who talked to you about the case.

"A. No one talked to me about the case.

"Q. Not a soul? A. No.

"Q. How did you know you were going to come up here and testify? A. Mr. Merrill asked me if I would.

"Q. Who is Mr. Merrill? A. I don't know.

"Mr. Douthit: He is from Abilene. Mr. Merrill was making an investigation at our request.

"Mr. Beall: Q. Mr. Merrill comes out to your place and dances? A. He has been there, yes sir.

"Q. Isn't he from Abilene, Texas? A. I don't know.

"Mr. Douthit: Yes, he is from Abilene, Texas.

"Mr. Beall: Q. Did he agree to pay you for coming up here? A. He did not, only my expenses.

"Q. How much did he agree to pay you? A. Not any certain amount.

"Q. You just voluntarily came up here to testify? A. Yes sir.

\* \* \* \* \* \*

"Q. Do you know what business Mr. Merrill is in? A. I think he is in the insurance business.

"Q. Isn't he a detective, too?

"Mr. Douthit: Counsel has gone over that repeatedly and we ask that the jury be retired a minute; we want to make a motion to the court.

"The Court: I believe it will be better for us to retire from the jury.

(Whereupon the court and counsel retired out of the court room, out of the presence and hearing of the jury, and the following proceedings were had:)

"Mr. Douthit: Be it remembered that on this 10th day of November—

"The Court: Are you moving to declare a mistrial?

"Mr. Douthit: Yes sir, we have got to preserve the record. (To Mr. Beall) We tried to keep you from bringing in the question of insurance, but you have ripped your pants now.

"The Court: I am going to overrule it.

"Mr. Douthit: Be it remembered that on this the 10th day of November, 1938, while the witness Mrs. Selby was on the stand testifying in behalf of the defendant, and

"Be it further remembered that while said witness was testifying on cross examination by Mr. James Henry Beall Jr. she was requested to answer a question as to who had talked to her about the case and the witness replied that Mr. Merrill had talked to her about the case, and thereupon counsel for the defendant questioned said witness relative to who Mr. Merrill was on several different occasions, and counsel for the defendant having admitted that Mr. Merrill was sent down to San Angelo to get defendant's various witnesses together, and that the said Mr. Merrill was sent there at the special instance of the defendant, and

"Be it further remembered that Mr. James Henry Beall, Jr., asked the witness as to who Mr. Merrill was and where he lived, and

"Be it further remembered that the said counsel further insisted on the witness telling what Mr. Merrill's business was,

whereupon said witness answered that he was in the insurance business, and

"Be it further remembered that counsel for defendant advised the court at such time that the question of insurance had been injected into the case and thereupon requested the court to declare a mistrial and discharge the jury:

"The Court: In your bill of exception the thing that will control in there is the questions asked and the answers of the witness and not what you stated, because he didn't ask what this man's business was, she volunteered that information.

"Mr. Harwell: Wait just a minute—

(Whereupon Mr. Harwell called some of the parties off to one side for a conference, after which he made the following statement:)

"Mr. Harwell: I would like to suggest, if I may do it, that I take her now and ask her whether she knows whether he is a detective or what he is, to eliminate any question about that if I can. If we can—this case is too long and hard and I am not anxious to try it over again.

"Mr. Beall: I am willing for you to do that.

(Whereupon the court and counsel went back into the court room and the following proceedings were had in the presence of the jury)

"Mr. Harwell: Q. Now, Mrs. Selby, you have been asked some questions here —as a matter of fact you don't know whether S. M. Merrill is a detective or what his actual business is? A. I certainly do not.

"Q. And any statement that you may have made there or may have been drawn out, that would not be based on any knowledge at all? A. None whatever.

"Q. And you have got no way of knowing that he is a detective? A. Certainly not.

"Mr. Harwell: Now, for the purpose of the record, to clear that up, we don't mind admitting in open court that Mr. S. M. Merrill investigates different cases and that he was investigating this case at our request in locating any witnesses he could for the defense, and he was down there at our request and got these witnesses and we expect to pay them whatever is reasonable and fair.

"The Court: All right.

"Mr. Harwell: Is that sufficient?

"Mr. Beall: Yes sir, we agree to that."

■ The general rule laid down in an opinion by Justice Critz in Page v. Thomas, 123 Tex. 368, 71 S.W.2d 234, to the effect that, in such a case as this, the introduction by the plaintiff of testimony which informs the jury that defendant carried indemnity insurance constitutes reversible error, is recognized. The general rule, and an exception thereto, is stated by Judge Hickman in Finck Cigar Co. v. Campbell, Tex.Com.App., 133 S.W.2d 759, 761, as follows:

"It is a well settled rule in this jurisdiction that it is error to inform the jury that the defendant in an action for damages for personal injuries is protected by indemnity insurance. Page v. Thomas, 123 Tex. 368, 71 S.W.2d 234; Texas Co. v. Betterton, 126 Tex. 359, 88 S.W.2d 1039; Southland Greyhound Lines, Inc. v. Cotten, 126 Tex. 596, 91 S.W.2d 326; Texas Power & Light Co. v. Stone, Tex.Civ.App., 84 S.W.2d 738, error refused. But that rule has no application when the defendant, or one of his witnesses, voluntarily brings such information to the jury, and it is not brought through any fault of the plaintiff or his attorneys. Carter-Mullaly Transfer Co. v. Bustos, Tex.Civ.App., 187 S.W. 396, error refused; Red Star Coaches Inc. v. Lamb, Tex.Civ.App., 41 S.W.2d 523, error dismissed; Williams et al. v. Long, Tex.Civ.App., 106 S.W.2d 378, error dismissed; 33 Tex.Jur. p. 278. As observed in the Carter-Mullaly case first above cited, were this exception to the general rule not recognized, the defendant would have it within his power to bring about a mistrial in all cases and the plaintiff would be unable to guard against it.

"The instant case comes well within the exception to the general rule. The matter about which the interrogatories were directed to the witness was a proper subject for cross-examination. There is not the slightest suggestion by the record that the attorney conducting the cross-examination overstepped the bounds of proper cross-examination. He propounded no question to which the answer given by the witness was responsive. We hold, therefore, that it was not reversible error for the trial court to overrule the motion to declare a mistrial."

■ That the mere mention of insurance does not constitute reversible error

is clearly shown by the decisions of our Supreme Court in Russell v. Martin, 121 Tex. 488, 49 S.W.2d 699, 701, and Horton v. Benson, Tex.Com.App., 277 S.W. 1050, 1051, expressly approving the holding of the Court of Civil Appeals in Horton v. Benson, Tex.Civ.App., 266 S.W. 213, 218. Also, see Russell v. Bailey, Tex.Civ.App., 290 S.W. 1108, 1109, writ dismissed; Jimmie Guest Motor Co. v. Olcott, Tex.Civ. App., 26 S.W.2d 373, writ dismissed, and Texas Cities Gas Co. v. Ellis, Tex.Civ. App., 63 S.W.2d 717.

As shown by the statement of facts the question asked the witness was, "Do you know what business Mr. Merrill is in?" The answer, "I think he is in the insurance business," was not responsive to the question asked. Clearly, the witness was called upon to answer either "yes" or "no." That is, that she did, or did not, know what business Mr. Merrill was in. We think it reasonably clear that said witness for the defendant volunteered the information that she thought Mr. Merrill was in the insurance business, and that such answer was not, at least, directly responsive to the question propounded by plaintiff's counsel. We are of the opinion that the exception to the general rule above quoted is applicable to the present situation. However, we are further of the opinion that the foregoing quotation from the statement of facts, showing merely a statement of defendant's witness that she thought Mr. Merrill was in the insurance business, taken in connection with her statement that she had no information, or knowledge, as to what business Mr. Merrill was in; that she did not know whether he was a detective or what his business was; was not calculated either to inform the jury, or give it the impression, that defendant was protected by indemnity insurance. Merrill's connection with defendant is not shown further than that he was directed by defendant's counsel to "gather" defendant's witnesses for the trial. But there are other reasons why we think said assignments must be overruled. No objection was made to either the question or answer complained of. As we understand the record, no motion for the court to declare a mistrial and discharge the jury was ever actually presented to the trial court for his action thereon. But, if we should be mistaken with reference to the last-mentioned matter, no exception to the action of the court in overruling such a motion, if it were presented and

overruled, is revealed by the record. We think a fair interpretation of the record is that during the dictation by one of defendant's counsel of a motion for the court to declare a mistrial and discharge the jury, the court stated he was going to overrule such a motion that the court pointed out to defendant's counsel dictating said motion that plaintiff's counsel had not insisted that said witness tell what business Mr. Merrill was in, but had only inquired whether she knew what business Mr. Merrill was in; that said witness' answer was not responsive to the question asked; that defendant's witness had volunteered such information, and, thereupon, upon the suggestion of another of defendant's counsel, and after a conference, defendant concluded said motion was probably not good, and, we think, very properly, concluded it would be advisable and desirable to cure the supposed error if possible and not to present such a motion to the court for his action thereon but to proceed with the trial of the case in an effort to obtain a final adjudication of the case on its merits. For the reasons stated, we conclude defendant waived its dictated motion for the court to declare a mistrial and discharge the jury. Therefore, we think said assignments must be and they are overruled.

That an objection to such testimony and an exception to the ruling of the court thereon are required is shown by the following authorities: Collins v. Panhandle Nat. Bank, 75 Tex. 254, 11 S.W. 1053; Johnson v. Hodges, Tex.Civ.App., 121 S.W.2d 371, 374; Texas Emp. Ins. Ass'n v. Hitt, Tex.Civ.App., 125 S.W.2d 323, 328; Foley v. Houston, B. & T. Ry. Co., 50 Tex.Civ.App. 218, 110 S.W. 96, 98; Galveston, H. & S. A. Ry. Co. v. Grenig, Tex.Civ.App., 142 S.W. 135, 140, writ refused; Simpson v. Whitesboro Nat. Bank, Tex.Civ.App., 120 S.W.2d 462, 463; Abshier v. Reavis, Tex.Civ.App., 54 S.W.2d 1102, 1104; Traders' & General Ins. Co. v. Bulis, Tex.Civ.App., 75 S.W.2d 965, 967; Standard Acc. Ins. Co. v. Williams, Tex.Com.App., 14 S.W.2d 1015, 1017; Wheeler v. Tyler S. E. Ry. Co., 91 Tex. 356, 359, 43 S.W. 876; 3 Tex.Jur. 188 et seq.; Dist. & County Court Rule 56, et seq.; Art. 2237, R.S.1925, as amended 1939 (Vernon's Ann.Civ.St. art. 2237); Texas & P. Ry. Co. v. Hilgartner, Tex. Civ.App., 149 S.W. 1091; Texas Law of Evidence (McCormick & Ray) p. 24;

**259**

Sulser v. Caraway, Tex.Civ.App., 134 S. W.2d 426, 427.

With reference to the health of Mrs. Lovejoy prior to the time that it is alleged she swallowed glass while drinking a bottle of coca-cola bottled by defendant, plaintiff, R. B. Lovejoy, testified as follows:

"Q. I want to ask you, Mr. Lovejoy, * * * prior to October 6, 1934, your wife had had some operations, hadn't she? A. Yes sir.

"Q. Do you know when those operations were had and what they were for? A. Well, the first one was in 1916 for appendicitis.

"Q. And the second was— A. The second was in 1925.

"Q. Where was that operation? A. Amarillo.

"Q. Do you know the extent of that operation—were you present at the time? A. Yes sir.

"Q. They just went in and operated— when they opened up the incision they found she was pregnant and they closed it back up? A. That is all.

"Q. What was that operation for? A. Dr. Root thought she had some kind of female trouble.

"Q. Later on did she have an operation? A. In 1929.

"Q. What was that operation for? A. Tumor.

"Q. Something connected with the female organs? A. Yes sir.

"Q. That was removed in 1929? A. Yes sir.

"Q. After 1929—up to that time had your wife been what you would consider an unhealthy woman? A. Yes sir—she never complained only at times with that trouble with her female organs.

"Q. After that operation was performed in 1929 I want you to tell the jury whether or not your wife recovered from that operation? A. Yes sir.

"Q. From 1929 until 1934, tell the jury what kind of physical condition your wife was in? A. Well, she was in as good physical condition as I ever saw her and she was always able to eat what she wanted and go where she could and wanted to and to do any kind of work.

"Q. During any of these operations— were any of the operations for stomach trouble? A. No sir.

"Q. Had she ever had any trouble with her stomach that you knew anything about? A. No sir, not at all."

Mrs. Lovejoy and other witnesses for the plaintiff testified, in effect, that for some time prior to and at the time she swallowed the glass she was, or appeared to be, in perfect health. The court submitted to the jury special issue No. 15: "Do you find from a preponderance of the evidence that the physical suffering, if any, that Mrs. Lovejoy has had since October 6, 1934, is due solely to a diseased condition of her body that is in no way connected with the swallowing, if any, of particles of glass? Answer Yes or No."

The jury answered, "No."

The court also submitted to the jury special issue No. 12, as follows: "What amount of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would adequately reimburse the plaintiff for such injuries, if any, sustained by Mrs. Lovejoy as the result, if any, of swallowing particles of glass, if she did, from said bottle of coca-cola? Answer in dollar and cents, if any."

The jury answered "$15,000.00."

In connection with special issue No. 12, the court instructed the jury as follows: "In answering the foregoing issue, you may take into consideration such diminished capacity, if any, sustained by Mrs. Lovejoy to look after the ordinary duties of a housewife and to care for and look after the family of the plaintiff, and such pain and suffering, if any, that she may have suffered since October 6, 1934, up to date, as the proximate result of such injuries, if any, sustained by her in swallowing, if she did, particles of glass from the bottle of coca-cola in question."

The defendant objected to Special Issue No. 12 and the instructions relative thereto, as follows: "The defendant further objects and excepts to the submission of Special Issue No. 12, and the instruction given to the jury thereunder, because the evidence raises the issue that a part of the plaintiff's wife's physical and mental pain and suffering, if any, were attributable to prior operations and other existing infirmities of her body which had no connection with the swallowing of glass and the court should instruct the jury in connection with said special issue 12 not to consider nor allow anything for physical pain and suffering, her mental pain and suffering, or

loss of earning capacity in the past or future attributable to such previous infirmities of her body which were attributable directly to such previous operations and other physical infirmities that plaintiff's wife had, which was not aggravated by the ingestion of the glass in question."

Defendant, by its sixth assignment of error and propositions thereunder, contends the action of the court in overruling its objection to the instructions following special issue 12, and in failing to instruct the jury that in arriving at the amount of damages to be awarded plaintiff it could not consider or allow any recovery for pain and suffering, or loss of earning capacity, caused by infirmities of her body existing at the time she swallowed glass (except such pain, etc., as may have resulted from an aggravation of her prior infirmity by swallowing glass).

Plaintiff relies upon the case of Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683, 685. Defendant's objections to the instructions given in connection with issue 12 were practically identical with the objections made to the instructions in the Ector case. Following the rule announced by the Supreme Court in the Ector case, it is our duty to reverse the judgment if the evidence raised the issue as to whether or not a part of Mrs. Lovejoy's suffering or incapacity in evidence was caused by her condition prior to swallowing glass. In the Ector case the Supreme Court said relative to said question: "The railway company offered testimony to the effect that Mrs. Ector had been suffering from some prior kidney disorders and that a part of the injuries which she received, if any, were but an aggravation of her prior kidney trouble. The fact of the existence of prior kidney trouble was denied by Mrs. Ector and her witnesses. It thus appears that an issue of fact was sharply presented as to whether Mrs. Ector was suffering from a kidney trouble prior to and at the time of the collision and as to whether or not a part of her suffering was attributable to a prior condition of her kidneys."

In Pedigo & Pedigo v. Croom, Tex.Civ. App., 37 S.W.2d 1074, 1075, writ refused, in considering the same question, this court said: "The evidence presents a situation where appellee was suffering from an infirmity before any of the alleged acts of negligence were committed by appellants."

In the instant case the existence of any infirmity or ill effects from the three operations suffered by Mrs. Lovejoy prior to swallowing the glass was denied by her. But defendant points to the following testimony as raising an issue of fact as to whether or not, at the time Mrs. Lovejoy swallowed the glass, she was suffering from the effects of such operations, and as to whether or not a part of her suffering and incapacity, described on the trial of the case, was attributable alone to the prior condition of her nervous system and body. Dr. Root, on cross-examination, testified:

"Q. I will ask you one assumption question right here. Assuming that a woman has had three major abdominal operations, is she in all reasonable probability what you would call a normal healthy person? A. A woman who has had three major abdominal operations would be mighty apt to be a nervous woman.

"Q. That very contraction down there you spoke of at the pyloric opening awhile ago was a sign of nervous tension of some kind? A. Well, according to my X-ray findings, it was.

"Q. That is what you found from your X-ray, is that correct, Doctor? A. Yes sir.

"Q. If a woman was a normal healthy woman, and she did take glass into her stomach, and assuming it did cut a place on the stomach wall, aren't the reasonable probabilities that she would have recovered immediately if it passed out within nine days? A. Well, a small cut on the—it would depend on how deep the cut was, but a small cut and the glass passed on it would be more apt to heal than give serious trouble, but if the glass remained in the cut—

"Q. If it passed out within nine days your testimony is it should have healed? A. Yes sir, I think so.

"Q. Isn't it true, if it passed out within the nine days and has not healed yet, isn't that a strong indication to you as a doctor that that woman's stomach was not a normal healthy stomach? A. Well, it might not, particularly being a woman's stomach, often a healthy stomach—I will say this, ulcers of the stomach cause—it is the common accepted theory—caused by some lesion, something that goes wrong in the stomach and something to keep that ulcer going, and to grow larger, one of the things that would do that is the hydrochloric acid which is constantly burning it, another would be this wave we were just talking about, instead of being a gentle wave, it could be a violent and rather vicious wave,

a violent and rather vicious wave coming down to interfere with the healing, another would be spastic condition at the pyloric opening, which this woman certainly has. That spastic condition means the stomach doesn't empty good. Now a person getting a cut of the mucus membrane of the stomach—one thing you will always have is that hydrochloric acid that is coming in the stomach, most of the time it will get well if not perpetuated because of the hydrochloric acid.

"Q. In other words, there must be something there in addition to that cut that is tending toward an ulcer, otherwise in all reasonable probability it should heal? A. Sometimes a cut in the stomach, if it perforates the stomach, cuts through the stomach, you are certainly going to have some trouble.

"Q. That is where it goes clear through the stomach? A. Yes sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, that spastic condition you spoke of at the pyloric opening, does that necessarily mean there was an ulcer there? A. No.

"Q. What are other things that might have caused that definite spastic thickening you spoke of? A. Appendicitis will cause it, inflammation of the gall bladder will cause it, inflammation of the lower gut—sometimes just general nervousness will cause it.

"Q. General nervousness will cause it? A. Yes sir.

"Q. Isn't it true that if a woman has had three major abdominal operations, and one of such operations found her pregnant and she was sewed back up and in a few months afterwards a child was born, doesn't that indicate that that would probably cause her to be a nervous woman? A. Yes, that would cause nervousness.

"Q. And would cause her probably to be a nervous woman? A. Probably, I couldn't say definitely, probably a woman that has had that would be a nervous woman.

"Q. Would probably be what we call a neurotic? A. Probably.

\*　　\*　　\*　　\*　　\*

"Q. Isn't it true, assuming this lady was a normal healthy person on October 6, 1934, and that she swallowed the piece of glass alleged here and passed it at the end of nine days isn't it true that the reasonable probabilities are that there never would

have been any serious effects from it? A. If she was a normal healthy person—it is true that a vast percentage would be that way, but to say that one out of a great number might suffer, I couldn't say definitely that that would be true.

"Q. But the reasonable probabilities are if she was a normal healthy person it should have healed up? A. Yes, there might be a possibility that it might not but if you take normal healthy robust people, with nothing in the world wrong or the matter with them, you would expect it to heal.

"Q. It is reasonably probable it would heal? A. Yes, if it was normal it is probable it would heal.

"Q. Isn't it true, taking into consideration the swallowing of all kinds of hard objects, pins, staples and everything else, not more than one per cent of all ulcers are caused by swallowing any such substances? A. That is true.

\*　　\*　　\*　　\*　　\*　　\*

"Q. And you also testified that the reasonable probabilities are that this lady, from the history of those operations that have been detailed to you, she wouldn't have probably been a healthy woman? A. She is probably a nervous woman.

"Q. And the reasonable probabilities are she wouldn't be what we call a normal healthy person? A. Would be nervous—.

"Q. Would she be a reasonably healthy person? A. No, I would say she would be abnormally nervous."

Dr. Lee on cross-examination testified:

"Q. Now, Doctor, if she had had three major abdominal operations prior to that time, one of which was in 1925 and they found that she was pregnant and sewed her up and she gave birth to a child a few months afterwards, and then in 1929 another major abdominal operation, the reasonable probabilities are she wouldn't have been a normal healthy person on October 6, 1934? A. I think it is impossible for any person to go through that, especially a lady, without becoming somewhat neurotic; I wouldn't regard her as normal, normal means in perfect health.

"Q. Now, on this question of a cut of the stomach wall, if a woman were a normal healthy woman, and a piece of glass such as you have heard described in this case had made an incision there in the mucus membrane, the reasonable probabilities are there would have been no serious

effects from it? It depends on the depth of any injury to the mucus membrane of the stomach as to the results; if it was cut deep enough to go through the mucus membrane entirely it would be difficult for it to heal, but just an ordinary cut in the stomach, the reasonable calculation and reasonable expectation would be that it would heal quickly.

"Q. Should have healed within a few days where the glass passed in nine days? A. Yes sir.

"Q. And that is what you would reasonably expect from it? A. I would.

* * * * * *

"Q. That piece of glass passing through a normal healthy stomach wouldn't be reasonably expected to cut clear through the stomach wall? A. No, not more than one time in a hundred.

* * * * * *

"Q. Isn't it true that a neurotic person is calculated to have that condition at the pyloric opening? A. Yes sir.

"Q. From general nervousness? A. Yes sir.

"Q. Or neurosis? A. Yes sir, that means a nervous condition or a disturbance of the nervous system.

* * * * * *

"Q. In all your experience as a doctor, have you ever known of a condition such as this lady has, unless her condition is due to it, that was due to swallowing glass or some other foreign substance? A. Never have.

"Q. And isn't it true that in all reasonable probabilities, if this lady had swallowed a piece of glass, the piece of glass she said she did swallow, and passed it within nine days, she would have recovered quickly? A. That is the reasonable expectation.

"Q. Now, the assumption is that if she was a normal person she would have recovered from it immediately? A. That is my opinion."

After giving most careful consideration to such testimony, and other of like import, we are unable to say that an issue was not raised as to the existence in Mrs. Lovejoy of a pre-existing infirmity attributable to said prior operations, which the jury might have believed contributed to pain, suffering and incapacity in evidence. Therefore, under the decision in the Ector case, the court should have affirmatively instructed the jury to exclude

such matter from their consideration in assessing plaintiff's damages. She is not entitled to recover from defendant for pain or incapacity resulting solely from something other than swallowing the glass. The finding in the answer of the jury to issue No. 15 (which, if it had been found favorably to defendant, would have constituted a complete defense) that Mrs. Lovejoy's suffering was not due solely to a diseased condition of her body in no way connected with swallowing glass, does not constitute a cure for the matter here complained of. The jury could have believed that Mrs. Lovejoy was extremely nervous and neurotic as a result of three operations and could have believed that the spastic condition at the pyloric opening, which prevented her stomach from completely emptying, was caused by such things; they could further have believed that she swallowed glass and that caused an ulcer of the stomach; they could have believed that the suffering and incapacity described on the trial were caused partly by one and partly by the other. So believing, the jury could properly have answered special issue No. 15, as it did, that Mrs. Lovejoy's suffering since October 6, 1934, was not due solely to a diseased condition in no way connected with swallowing glass. Nor is it an answer to the complaint made to say that in issue 12 the jury was asked to fix the compensation for swallowing glass, and in the issue the jury was, in effect, told to fix the compensation for the suffering and incapacity which was a proximate result of the injuries sustained by her in swallowing glass from the bottle of coca-cola. Under the rules laid down by the Supreme Court, the improper elements must be expressly excluded. International & G. N. Ry. Co. v. McVey, 99 Tex. 28, 32, 87 S.W. 328; Hines v. Kelley, Tex.Civ. App., 252 S.W. 1033, 1035; Pedigo & Pedigo v. Croom, Tex.Civ.App., 37 S.W.2d 1074, 1075, writ refused.

We, therefore, hold that the court erred in failing to sustain the objection to that portion of special issue No. 12 which instructed the jury what things they might consider in arriving at the amount of damages to be awarded plaintiff, and hold that the court should have instructed the jury, in connection with the instructions given, in such manner as to expressly exclude from their consideration in awarding damages any suffering, etc., resulting from the previously existing infirmity of Mrs. Lovejoy (except suffering, etc., resulting from

an aggravation of her previous condition by swallowing glass). Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W. 2d 683; Burlington-Rock Island R. Co. v. Ellison, Tex.Civ.App., 134 S.W.2d 306, 307, writ refused; see also, Ft. Worth & D. C. Ry. Co. v. Bozeman, Tex.Civ.App., 135 S.W.2d 275; Morrow v. St. Louis, A. & T. R. Co., 81 Tex. 405, 17 S.W. 44; San Antonio & A. P. R. Co. v. Carpenter, Tex. Civ.App., 13 S.W.2d 929, 932.

In Pedigo & Pedigo v. Croom, supra, a similar issue as to the amount of damages to be awarded plaintiff was submitted. There the instructions accompanying that issue were, so far as is here material, essentially the same as in the present case. The defendants there objected "because said question does not exclude from the consideration of the jury the injury or probable consequence of injury sustained by H. C. Croom and being suffered by him prior to the time these defendants were engaged to treat him, and further because said question does not exclude that pain and suffering and loss of earning power past and future which would have been or might have been reasonably expected to be the natural consequence of his original injury." There this court said: "Error is assigned to the action of the trial court in overruling this exception and objection. The evidence presents a situation where appellee was suffering from an infirmity before any of the alleged acts of negligence were committed by appellants. The most for which appellants could be charged would be the injuries sustained by appellee in addition to those which would have been sustained as a direct result of the broken leg. The injuries flowing from the original accident, and those flowing from the alleged negligence of appellants, were so connected and intermingled that appellants had the right to have the charge affirmatively limit the jury in its consideration to the injuries resulting alone from their negligence and *excluding such injuries as were the result of the original accident.*" (Italics ours.)

For the sole reason that the court overruled the objection to the instruction accompanying the special issue as to the amount of damages, and did not, in said instruction accompanying said special issue, expressly exclude suffering, etc., resulting from plaintiff's prior condition, this court reversed that judgment. The Supreme Court refused a writ of error.

Whether some part of Mrs. Lovejoy's suffering or incapacity resulted from her prior condition was not an issue to be submitted to the jury. If such an issue had been submitted and answered, what effect could it possibly have had in the rendition of a judgment? If such improper elements cannot be excluded from consideration in a case submitted on special issues, in the manner directed by the Ector and Pedigo cases, in what manner are they to be excluded?

While defendant's manager was testifying, the defendant asked him: "Q. State whether or not it (meaning the machine that bottled the coca-cola from which Mrs. Lovejoy drank) was the most highly improved machine from the standpoint of bottling a pure, safe coca-cola drink known to the industry at that time." The question was objected to as calling for a conclusion and opinion of the witness. The court stated: "If he knows he can answer the question." Defendant's counsel then inquired: "Q. Do you know whether it was that type of machine, the most highly improved? A. I would say it was, yes sir." On cross-examination by plaintiff's counsel he was asked: "Q. Now you testified that that machine was the most highly improved machine known to bottling science, in your opinion? A. Yes sir, in my opinion, and to the best of my knowledge it was." After further cross-examination in which the witness testified that said machine was highly approved by the industry from the standpoint of economy, efficiency and safety, in his opinion, he was asked by plaintiff: "Q. Have you seen a machine that employed one man alone to inspect bottles?" To which the defendant objected, "unless he shows it is the same size machine we have here, and shows similar conditions." Plaintiff's counsel stated to the court, "He testified in his opinion, and I have a right to cross examine him." The objection was overruled and the witness answered: "I have never seen a four wide soaker in operation where they used more than one man as an operator and to inspect them; I have seen 12 wide soakers in operation where they filled a lot more bottles than we do where they used one man to inspect bottles." Plaintiff's counsel then asked: "Have you ever seen a machine where they had these bottles inspected under a magnifying glass", which question was objected to by defendant "on the ground it is not shown to be the same

or similar conditions between that which counsel is asking about and the machine actually employed in this case." The objection was overruled and the witness answered: "I have seen a machine where a magnifying glass was used but I know of no plant using one at present." The action of the court in overruling the objections to said questions constitute the basis of defendant's assignments of error Nos. 7 and 8.

The witness having testified for the defendant that in his opinion its machine was the most highly improved machine known to bottling science, we think the court's action was not error and that it was proper to allow the plaintiff, on cross-examination, considerable latitude to ascertain the accuracy of the knowledge and judgment of the witness upon which the witness' opinion was based. Brown v. Chenoworth, 51 Tex. 469, 478; Texas Law of Evidence by McCormick & Ray, p. 364, 365; Evansich v. Gulf, C. & S. F. Ry. Co., 61 Tex. 24; Denton v. English, Tex.Civ.App., 171 S.W. 248; International & G. N. Ry. Co. v. Dyer, 76 Tex. 156, 13 S.W. 377; Murray v. Morris, Tex.Civ. App., 17 S.W.2d 110, 111; Missouri K. & T. Ry. Co. v. Rich, 51 Tex.Civ.App. 312, 112 S.W. 114, 116.

The cases relied upon by defendant, to-wit, Southern Gas, etc., Co. v. Adams, Tex.Civ.App., 169 S.W. 1143; Texas & P. Ry. Co. v. Cauble, Tex.Civ.App., 168 S.W. 369; Texas & P. Ry. Co. v. Good, Tex. Civ.App., 151 S.W. 617, 619, we think are not applicable.

Also, see Cameron Compress Co. v. Whitington, Tex.Com.App., 280 S.W. 527, 529; Whittington v. Cameron Process Co., Tex.Civ.App., 268 S.W. 216, 221; City of Houston v. Pillot, Tex.Com.App., 105 S.W.2d 870, 872; Id. Tex.Civ.App., 73 S.W.2d 585, 591.

 We are of the opinion that the evidence does not raise the issue as to whether the condition from which Mrs. Lovejoy has suffered, or is suffering, is due solely to a mental reaction from knowing, or thinking, she swallowed glass, nor does it raise the issue of unavoidable accident. With reference to the latter issue our statement in Texas Coca-Cola Bottling Co. v. Wimberley, Tex.Civ.App., 108 S.W.2d 860, 863, is equally applicable here. Assignments Nos. 9 and 12 are, therefore, overruled.

Since the judgment must, for the reason stated, be reversed, we do not pass on the question as to whether the large judgment rendered is excessive.

The judgment is reversed and the cause remanded.

FUNDERBURK, Justice (dissenting).

Negligence of the defendant was by the verdict of the jury found to have been a proximate cause of injuries to Mrs. Lovejoy. The verdict, insofar as its subject matter consisted of the issues which plaintiff had the burden of establishing, contained no description of the injuries. In other words, the particular nature and extent of the injuries do not appear from that part of the verdict.

In addition to the issues which plaintiff had the burden of establishing there were others, one being whether "the physical suffering, if any, that Mrs. Lovejoy has had since October 6, 1934, is due solely to a diseased condition of her body that is in no way connected with the swallowing, if any, of particles of glass." This issue particularized, wholly or partially, the "injuries" which by other portions of the verdict were found to have been proximately caused by negligence of defendant. The finding that Mrs. Lovejoy's physical suffering after swallowing the glass was not due solely to a diseased condition of her body must be regarded as tantamount to a finding that her "injuries" as referred to in the other issues were not due solely to disease. If her "injuries" were not due solely to disease, in no way connected with swallowing the glass, but, as otherwise found, were due to (caused by) swallowing the glass, then what, if any, part of the total consequences of swallowing the glass should be excluded from the total amount to be awarded as damages? There was no evidence of any items of damages resulting from swallowing glass as to which the law does not permit recovery. There was, therefore, nothing to be excluded either in the statement of the special issue or instruction accompanying it.

The principle sought to be applied is not believed to be applicable to the state of facts presented. That principle relates to cases wherein after it is determined that injuries have resulted from negligence as the proximate cause thereof the law will not permit recovery of compensation for some of the results of such injuries. Good examples are death actions in which the policy of the law forbids recovery of damages for mental

grief, or suffering, or loss of society, affection or companionship, although they result from the very injury for which the recovery of damages is awarded. Such are the cases of St. Louis S. F. & T. Ry. Co. v. Houze, Tex.Civ.App., 28 S.W.2d 865; Dallas Ry. & T. Co. v. Moore, Tex.Civ.App., 52 S.W.2d 104; Texas & P. Ry. Co. v. Phillips, Tex. Civ.App., 56 S.W.2d 210.

The principle has also been applied in a few cases where the injuries, the damages from which are sought to be recovered, are but a part or phase of certain indisputably existing injuries as to which there is no issue, or as to which because of some policy of the law there exists no right of action. Examples of such cases are Times Pub. Co. v. Ray, Tex.Civ.App., 1 S.W.2d 471; Galbraith-Foxworth Lumber Co. v. Gerneth, Tex.Civ.App., 66 S.W.2d 471; Pedigo & Pedigo v. Croom, Tex.Civ.App., 37 S.W.2d 1074. In such cases there was no question of damages claimed by plaintiff to have resulted from a particular injury for which the defendant was sought to be held responsible and, by way of defense, claimed by the defendant to have resulted from another and different injury for which defendant was not responsible, the issue having been found in favor of the plaintiff. In this case, had the jury been instructed in such way as to meet the objection to the instruction given, the jury could not have excluded anything from the award of damages without disregarding the other part of their verdict to the effect that the "injuries" (not a part of them) were caused by swallowing the glass.

If although as a whole the injuries were not due solely to pre-existing disease, but as to some ascertainable and definite part thereof, they were due *solely* to disease (and, therefore, not to swallowing glass) that was, under the decisions, a defensive issue. It was not submitted and not requested to be submitted. It was an issue analogous to the defensive issue of partial, or of temporary, incapacity in a suit by which plaintiff seeks to recover compensation for total and permanent incapacity. There can be no difference in principle between a defensive matter which constitutes a complete defense and a defensive matter which constitutes a pro tanto defense, or, in other words, defense to a definite part of an asserted cause of action or claim to damages. Surely no higher authority for this proposition need be mentioned than those decisions holding that issues of partial incapacity and issues of temporary incapacity as defensive issues are required to be given.

The writer cannot believe the decision in Dallas Ry. & T. Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683, 684, should rule the decision of this case. The Ector case, while recognizing the duty of the court, in a case submitted upon special issues, to give a charge or instruction on the law relating to an issue of (the amount of) damages, no less certainly declares that the only authority therefor is the provision of R.S.1925, Art. 2189, requiring the court to submit "such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict", etc. It would follow necessarily that if in the statement of an issue of (amount of) damages no legal term was used there would be no necessity for giving a charge or instruction upon the law applicable to such issue. That was exactly the case before the court. The issue submitted was stated thus: "What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably compensate the plaintiff for the physical and mental suffering, if any, of his wife, Ethel Ector, in the past, if you find there has been any in the past, and in the future, if you find there will be any in the future, and for her diminished capacity to labor and earn money, in the past, if any, and in the future, if you find there will be any in the future, and for reasonable and necessary expenses heretofore incurred for doctor's bills, if any, (not including witness fees) resulting directly and proximately from the injuries, if any, of Ethel Ector?" Regarding this issue, the court, after observing that "The most common form for submitting the question of damages in a personal injury case is for the court to call on the jury to determine plaintiff's damages and then follow the question with instructions as to the elements properly to be considered in arriving at the damages," further said: "It will be noted that in the instant case the court adopted a different, and *we think preferable, method of submitting the question by embodying the elements in the issue itself * * *."* (Italics ours.) Thus it appears that according to the preferable method of submitting the issue it was improperly stated, in that it failed to exclude affirmatively improper elements. Regarding this, two or three things may be stated as certainties. It is certain, in the first place, that if the issue had been objected to on the ground of its failure to mention and exclude the elements which should have been excluded there would have existed no necessity for explaining or defining any

legal term,—none such being used in the statement of the issue,—but, even if there had been, there could have existed no necessity of giving a charge or instruction to exclude items of damages, such exclusion having been effected by the very statement of the issue. In the second place, it is certain that if such an objection had been made and the court had overruled same, the right would have existed to have such action reviewed upon appeal. It is undoubtedly a sound proposition of law that any wrong ruling of a court, not constituting fundamental error, which is not excepted to and not assigned as error, will be waived. Hence there was presented a case of a defectively stated issue, imposing upon the defendant the obligation by objections to point out the defects in order to afford the court the opportunity of correcting them upon penalty for failure to do so of the waiver of the defects. With interest, therefore, we look to the objection that was made. Here is the objection: "Defendant further objects to issue No. 5, because *the evidence raises the issue* that a part of the plaintiff's physical and mental suffering, if any, were attributable to some kidney trouble which had no connection with the accident and the court should instruct the jury in connection with issue No. 5 not to consider nor allow anything for physical and mental suffering or loss of earning capacity in the past because of so much of the kidney trouble, if any, that plaintiff had which was not an aggravation by the accident." (Italics ours). This objection, it is to be observed, was not directed to any defect in the statement of the special issue. On the contrary, without embodying any such objection, it complained of the failure of the court "to instruct the jury *in connection with issue No. 5* not to consider nor allow", etc. (Italics ours.) The objection also set forth the contention that the evidence *raised a certain issue,* namely, "that a part of plaintiff's physical and mental suffering, if any, were attributable to some kidney trouble which had no connection with the accident." With this contention the court agreed "that an *issue of fact was sharply presented* as to whether Mrs. Ector was suffering from a kidney trouble prior to and at the time of the collision and as to whether or not a part of her suffering was attributable to the prior condition of her kidneys." (Italics ours.) The issue referred to as so raised by the evidence, was not submitted as a special issue. It was undoubtedly a defensive issue. Why then was it not waived? The conclusion of the court

to the effect that because such issue was raised by the evidence there was error in not giving the charge or instruction to the jury directing the omission of the particular elements of damage poses an important question of practice which may be formally stated thus: In the submission of a case upon special issues, may a necessary or proper issue, not otherwise submitted, be, in effect, submitted by means of a purported definition or explanation of a legal term used in the statement of an issue which is submitted; the effect of such explanation or definition being to require a particular answer to the issue submitted accordingly as the jury may find upon the issue not submitted? It is not believed that the Supreme Court by its adoption of the opinion in the Ector case intended to sanction an affirmative answer to said question; yet, that conclusion would seem to be inescapable if the decision is to be deemed controlling in the instant case. In the case here the evidence raised an issue of fact as to whether all of Mrs. Lovejoy's injuries and consequent damages resulted from swallowing glass, or from disease, not affected by swallowing glass. The jury in response to an issue submitted found that the injuries did not result solely from the disease. That issue involves a complete defense. If the same evidence, or any other evidence, raised an issue that the injuries, although as a whole, not solely caused from disease, yet, as to some ascertainable part, were solely so caused, was not that just as much an issue for submission, and jury verdict thereon, as the issue involving a complete defense? What difference could there be in the controlling principles, and applicable procedure, between an issue constituting a complete defense to all of an asserted claim and one constituting a complete defense to a definite part of such asserted claim? To attempt to recognize any such difference would bring us into inevitable conflict with principles and decisions which it is unreasonable to suppose there has been any intention or purpose to repudiate.

In the Ector case it was said: " * * * the difference in the form of submission cannot be made to alter the rights of the defendant to have an affirmative exclusion of improper elements" (of damage). This was said in reference to two different forms of submitting the issue of damages—one said to be the usual way, and the other, the preferable way, (the one employed). Attention has already been directed to the self-evident proposition that by the preferable way the necessity of giving a charge or instruction

"in connection with" or in addition to, the statement of the issue, would be obviated. The right of review would be fully preserved, to correct any error in the statement of the issue when the court having his attention directed thereto by proper objection had failed to make such correction. Apparently, the view was expressed that although the issue of (the amount of) damages was improperly stated, and had it been properly stated there would have been no necessity for giving in connection with the issue a charge or instruction, and although no objection was made to the improper statement of the issue, but only to the omission of the court to give the charge or instruction, yet nevertheless the court erred because the defendant had a right "to have an affirmative exclusion of improper elements." Did the court mean to say, in effect, that the right mentioned was not subject to waiver because of non-compliance with the law governing procedure? It seems that upon this point there is internal evidence of inadvertence and mistake. *The issue submitted did not contain the word "damages."* It was expressly declared that the only authority for giving a charge or instruction was the authority to give explanations and definitions of legal terms. What legal term was being defined or explained by the charge in question? It would seem utterly unreasonable to impute the intention of the court to declare that the duty of the trial court in submitting a cause upon special issues to give such explanations and definitions of legal terms as "shall be necessary to enable the jury to properly pass upon and render a verdict on such issues" would authorize the giving of a charge or instruction when no legal term was used in the statement of an issue.

Undeniably much confusion and conflict exists in the decisions in this state which have some bearing upon the particular question under consideration. The writer is convinced that it originates in a failure to appreciate inherent differences between the two methods of submitting jury cases—upon a general charge and upon special issues. In submitting a case upon a general charge the submission of the issues is an inseparable part of the charge or instructions upon the law relating to the issues. The function of the charges or instructions is to inform the jury of the law to the sole end of enabling the jury to apply the law to its findings, (whatever they may be) upon the issues of fact. When the radically different method of submission upon special issues is adopted it is inherent in the very nature of such different method that there must be a separation of the issues from the charges or instructions. The issues are required to be so stated that the findings thereon will constitute only findings of fact. After the separation what becomes of the charges and instructions? Why should it be necessary in addition to the submission of the special issues to give such charges or instructions? To say that in any case submitted upon special issues it is necessary to give a charge or instruction upon the law governing any or all of the special issues is tantamount to a denial of the proposition that the jury under such plan of submission need not, and ought not, to be informed as to the law.

The opinion in the Ector case assumes that the explanations and definitions required by the statute in submissions upon special issues, perform the same, or similar, function as charges or instructions in cases submitted upon a general charge. Do they? The function of an explanation or definition of a legal term is to enable the jury to understand the meaning of the legal term. The function of a charge or instruction is to inform the jury of the law in order that the *legal effect* of their findings of fact, may be truly declared by their general verdict. How, then, in view of these totally dissimilar functions, can it ever happen that an explanation or definition of a legal term, in order to be adequate, must consist of, or, at least must include, a charge or instruction upon the law relating to an issue? It is submitted that no such situation can ever arise; and any attempt to do so would be a gratuitous disregard of the basic reason for the method of submitting cases upon special issues in that it unnecessarily introduces the very thing which it is the purpose of that method to avoid.

Suppose in this case, as also in the Ector case, the issue had been stated as was said in the latter to be the usual, although less preferable way, in substance as follows: What do you find from a preponderance of the evidence is the amount of damages, if any, sustained by the plaintiff as the result of her injuries, if any? The legal term requiring explanation or definition, if any, would be the word "damages." Webster's International Dictionary gives the definition of "damages" as a legal term thus: "The estimated reparation in money for detriment or injury sustained; compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." There is nothing in this definition concern-

ing the inclusion and exclusion of elements. No explanation or definition of the word "damages" would, in any event, be required unless upon the presumption that the jury did not understand the meaning of the word. Indulging that presumption we may ask, would the instruction which it was held the court erred in not giving have enabled the jury to understand the meaning of damages? The instruction merely informed the jury that from the amount of compensation, if any, to be found, there should be excluded certain elements. What was the authority of the court, even if the case were submitted upon a general charge, to instruct the inclusion or exclusion of the particular elements? Can there be any other answer than that the law authorizes recovery of those to be included and forbids recovery of those to be excluded? And, if so, can there be any argument against the proposition that an instruction to the jury to make such inclusions and exclusions would be a charge or instruction upon the law? The point, however, which is here sought to be emphasized is that if the jury did not know the meaning of the word "damages"—the only reason for giving a definition or explanation of such term in any event—they would gain no better knowledge from the charge. The charge performed no function of an explanation or definition of the term.