**SUN OIL COMPANY, Appellant,**

v.

**L. C. PIERCE et al., Appellees.**

**No. 15214.**

United States Court of Appeals
Fifth Circuit.

July 15, 1955.

Rehearing Denied Aug. 16, 1955.

Donald L. Case, Henry D. Akin, Otis B. Gary, and George P. Gardere, Robertson, Jackson, Payne, Lancaster & Walker, Leachman, Gardere, Akin & Porter, Dallas, Tex., for appellant.

Charles B. Jones, E. L. Klett, J. E. Vickers, Ralph Brock, Lubbock, Tex., John J. Watts, Odessa, Tex., Klett, Bean & Evans, Trout & Jones, Lubbock, Tex., for appellee Johnston Testers, Inc.

Before HOLMES and RIVES, Circuit Judges, and WRIGHT, District Judge.

### RIVES, Circuit Judge.

Appellee Pierce sued appellant Sun Oil Company and appellee Johnston Testers, Inc. for damages on account of personal injuries sustained by Pierce at the site of an oil well being drilled for Sun Oil. Pierce was a driller in the employe of Baker-Taylor Drilling Company engaged by Sun Oil to drill the well. Johnston Testers, Inc. was engaged by Sun Oil to run a drill stem test on the well. Sun Oil kept its foreman on the job and retained over-all supervision and direction of the work. The fire which caused Pierce's injuries occurred while Pierce and his drilling crew were in the process of removing the drill stem from the well. Sun Oil sought indemnity or contribution from Johnston Testers in the event of a judgment againt it. The jury found for Pierce against Sun Oil, but exonerated Johnston Testers. Upon that verdict judgment was rendered against Sun Oil in the total amount of $52,000.00 from which this appeal is prosecuted.

A part of the testing equipment furnished by Johnston Testers was a safety device referred to as a "circulating sub", the purpose of which was to permit oil and gas to be removed from the drill stem so that when the pipe was removed from the well it would be "dry". The well was considerably more than a mile deep, to be exact 6837 feet. The circulating sub was a part of the test tool attached to the end of the drill stem near the bottom of the well. It contained a lead plug which ordinarily can be blown out by pressure from inside the drill stem. It was then intended that mud would be forced into the well between the outside of the drill stem and the inside of the casing, and that such mud would enter the drill stem through the hole in the circulating sub, and be forced upward through the drill stem unloading the oil and gas into the slush pit at the side of the well.

On the occasion in question, several efforts were made to force the plug from the circulating sub, but without success. Sun Oil's foreman, Mr. Carroll, testified:

"Q. Now after you had tried several times, what decision did you come to then? A. I talked to the Johnston man, as I said before, talking to him all the time. I wasn't too familiar with—with the plug I didn't know just exactly what could have been wrong with it, and we were getting on, it was getting late in the evening, but we wanted to get out of the hole before dark with the pipe, in any event, in case they weren't able to open the plug there, which they weren't. Why we knew there was going to be fluid left in the pipe and it would be dangerous to wait until after the lights were turned on.

"Q. You were in a hurry to get the pipe out? A. I wanted to get it out before dark, yes, sir.

"  *  *  *  *  *  *  *

"Q. So you instructed the crew to start coming out with it? A. I instructed my—probably my conversation was with Mr. Putman, the pusher.

"Q. He was the tool pusher in charge of the workers handling the physical operation there on the rig? A. That is right.

"Q. You instructed him to bring it out? A. Yes, sir."

Appellee Pierce reported for duty after efforts to blow the plug had been abandoned, and while the crew was in the process of removing the drill stem. About thirty-three hundred feet of dry drill stem had been removed. Just after Pierce and his crew went on duty "it made a head and blew oil and gas all over the floor, the location and us, the rig and everything." Pierce immediately shut down the motors, and thereafter oil and gas continued to come out of the

drill pipe for fifteen or twenty minutes, but at this time without catching fire. The oil and gas on and about the rig was washed down into a pit. Sun's foreman, Mr. Carroll, further testified:

"Q. After they had washed it down then, what did you instruct them to do then?

"A. I didn't stay there after they started washing it down. I went— I had some oil on me, quite a bit on my clothes and I went back to camp. Putman told me he was going to wash the thing down and get it—I believe he told me he was going to town, also, and get some electric light wires, some new wires to put on the rig in case any of those were oil soaked. I went on back to camp and changed clothes and tried to wash my car.

"Q. Well, was your instructions, that after they got it cleaned up, to go ahead and finish pulling it, try to get it out before sundown?

"A. Yes, sir, we had to get it out before sundown if we could."

Pierce suggested to Mr. Putman, "tool pusher" for Baker-Taylor, the drilling contractor, and Pierce's immediate superior, that another effort should be made to blow the plug. Putman said, "he didn't believe there was any use, because it had already done blew all it was going to blow." There was evidence that Sun's foreman and Johnston Testers' employee were standing by. Pierce and the crew then continued taking the drill stem out of the hole. By the sound of a hammer on the pipe Pierce knew that the drill stem was full of oil. At the request of Sun's foreman, he drew off a sample. What then occurred is best told in Pierce's testimony:

"Q. How did they take that sample? A. Well, we put the collars on it and just barely cracked it. Just enough to loosen it to where this oil would seep out real slow down the tool joint into a bucket down there. We got, I would say about a gallon in the bucket.

"Q. Is that the usual way you have been taught to take a sample? A. Yes, sir.

"Q. You were doing that at the request of the Sun Oil Company? A. Yes, sir.

"Q. Now then, after you got the sample, what happened? A. Well, we put this mud box on and finished screwing the pipe on out. And whenever this pipe, it was full of oil—

"Q. This mud box, what is a mud box? A. Well, that is a—it is a long piece of casing, you might say, that is what I call it, and it has been split half in two and fixed where it would lap around the pipe, see, and then it is closed in at the top and bottom to where it will fit around this drill pipe and then it has a four inch junction at the bottom with a four inch hose on it to carry the oil or fluid or whatever it is in there in the drill pipe out away from the rig.

"Q. What is the purpose of that mud bucket there? A. To keep this fluid from getting all over the floor and the guys working there.

"Q. In other words, this drains off this fluid that is in the pipe that is being disconnected and runs it out to the pit, is that it? A. That's right.

"Q. Now did you have the mud bucket in place? A. Yes, sir.

"Q. Was it latched? A. Yes, sir.

"Q. What happened? A. Well, whenever I got this unscrewed, I had to keep just a little tension on it so that whenever I was turning the bottom of it, the top of it wouldn't turn too. And whenever it come unscrewed it jumped up a little bit and that let that oil out all at once, and it started coming out all around the mud box, all over the floor, and just as soon as it did that I pushed the brake down and jumped on the drum clutch and that killed everything, you know the rig, the motors and

everything. The motors had an air whistle on them, and whenever the motor was dead or died these whistles would start blowing. This motorman, he goes back and cuts one of the whistles off and was cutting the other one off when it sounded to me like a big covey of quails flew up. I turned around and looked at the guys on the floor, I thought they was making some kind of noise with their mouths, and there was fire all over the floor back there, about knee deep.

"Q. Now, this mud bucket, when you raised the pipe up, the oil flowed out of the bottom of it. Does that mud bucket ordinarily take off all the fluid from the standing pipe that way? A. Not if there is pressure on it, it don't.

"Q. Was there any pressure on it? A. Well, the pressure of this whole stand of oil, see, was coming out of this stand, it was coming out all at once and the rest of this drill pipe was heading up too.

"Q. It was heading again also? A. Yes, sir.

"Q. Was it the additional heading that caused this spewing out of the oil and gas? A. Yes, I imagine it was.

"Q. When you saw the fire, then what did you do? A. Well, I turned and run back—started back, I just remember starting back toward the dog house, and that was the last I remembered until I got plumb through the dog house. When I got to the back door of the dog house I was on my stomach, and how I got down there I don't know. Just as soon as I regained consciousness I jumped up and looked down the step to see if there was fire blowing across the steps, and there wasn't, so I run down them and run jumped in the mud pit to put my clothes out and went on up to get some of the guys to take me to town.

"Q. Some one took you into town? A. Yes, sir.

"Q. Where did you go? A. To the hospital."

The court submitted to the jury only one ground of negligence which had been alleged by Pierce in his complaint against Sun Oil Company:

"You are further instructed, Gentlemen, that if you find and believe, from a preponderance of the evidence, that the Defendant, Sun Oil Company, Inc., was negligent in not directing a further attempt to break the plug in this circulating-sub right after the stack of drill pipe —right after the oil and gas in the stack of drill pipe headed and the oil spewed out the first time; that is, at that point where some thirty-three hundred (3,300) feet approximately of drill pipe had already been pulled from the well. And if you further find and believe, from a preponderance of the evidence, that such negligence of said Defendant was the or a proximate cause of the fire that later occurred, and the injuries sustained by the Plaintiff, then and in that event you will return a verdict in this case for the Plaintiff and against that Defendant unless, in spite of such findings, you find for said Defendant under later parts of this Charge. Of course, it is obvious in connection with this alleged ground of recovery just submitted to you, that besides the matter of foreseeability, there could not be any proximate cause in this respect, unless you believe and find from a preponderance of the evidence, that if further attempts had been made at that time to break the plug, that is reasonable attempts, either attempt or attempts as you think would have been reasonable, would also have been successful and broken the plug."

An expert witness introduced by Johnston Testers testified on cross-examination that if another attempt had been made to blow the plug of the circulating sub after this approximate 3,300 feet of drill stem had been pulled from the well,

such attempt would probably have been successful.

Pierce was twenty-five years of age; he had been a rough neck for eight or nine years, and had been promoted to driller for only two or three months. He had seen drill stem tests run before and had on occasions pulled wet pipe. However, although he knew smoking was prohibited around wet pipe, and that motors should be shut down to avoid the risk of fire, and he had seen wells head out and spray oil and gas, he had never before seen or heard of one catching fire, and he testified that, at the time of the accident he did not know that the operation was dangerous. Sun Oil's employees and Johnston Testers' employees were more experienced, and had known of fire being started around wet pipes, but none of them warned Pierce.

■ We recognize the law in Texas to be as stated in the recent case of Robert E. McKee, General Contractor v. Patterson, Tex., 271 S.W.2d 391, 393, that the duty owed by a general contractor to employees of a sub-contractor is similar to that owed by an owner or occupier of land to his invitees, and does not extend to those persons who know or should know of the existence of the particular condition, and who appreciate or should appreciate its dangers. The same knowledge and appreciation of danger on the part of the employee of the subcontractor, which negative any initial duty owed to him by the general contractor, may also be the basis of the affirmative defenses of voluntary exposure to risk and contributory negligence. In that case, however, there was nothing like the degree of over-all supervision, control and direction of the work on the part of the general contractor as existed in the present case, nor was there the implied assurance of safety in operation by the general contractor's insistence on speed without further precautionary efforts. The evidence was clearly such as that the jury might reasonably infer that Pierce did not fully appreciate the danger, that Sun breached the duty which it owed him, and that he was not guilty of contributory negligence nor of voluntarily assuming the risk.

The case was submitted to the jury on a general oral charge to which Sun Oil reserved no exception for failure to submit separately its claimed defense of *volenti non fit injuria*, nor did it make a written request for a charge on such defense. As heretofore indicated, practically the same issue was presented on the question of whether Sun Oil was guilty of any initial negligence, for it would have owed no duty to an employee of a subcontractor who voluntarily assumed the risk.

■ Sun Oil next urges that there was evidence that it had retained such complete power to direct and control Pierce that the issue of loaned, special, or temporary servant should have been submitted to the jury, as referable to its contention that Pierce's exclusive remedy was under the Texas Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. This question was not, however, presented to the district court either by objection to the oral charge or by request for a special written instruction, and there was ample evidence that Sun retained merely the right to supervise the work and not such power to direct and control Pierce as would make him Sun's employee for the time being. See Hartford Accident & Indemnity Co. v. Addison, 5 Cir., 93 F.2d 627, 629. Cf. American Smelting & Refining Co. v. Maloy, 5 Cir., 198 F.2d 206.

■■ In one of the physicians' testimony, he inadvertently used the expression, "the insurance company concerned," meaning Pierce's employer's compensation carrier. The court offered to clear the matter up by instruction to the jury, but Sun's counsel objected to that course and insisted on a mistrial. Clearly the court did not err in denying the motion for mistrial. See Texas Coca-Cola Bottling Co. v. Lovejoy, Tex.Civ. App., 138 S.W.2d 254, 257, 258; D. & H. Truck Line v. Lavallee, Tex.Civ.App., 7 S.W.2d 661. The court's refusal to grant a continuance to Sun for the taking of

586

additional medical testimony was obviously within the range of its discretion. Likewise, the objections to the oral charge are not so serious as to require discussion.

 Lastly, appellant Sun urges that the court erred in failing to enter judgment on its cross action against Johnston Testers, Inc. for indemnity or contribution. Under the evidence, we think, a jury question was presented as to the liability of Johnston Testers, and by its verdict the jury exonerated that Company. Since there was no motion for a directed verdict against Johnston Testers, Sun is not in position to insist on judgment against it notwithstanding the verdict. Rule 50(b), Federal Rules of Civil Procedure, 28 U.S.C.A. The same reply holds true as to Pierce's cross-appeal against Johnston Testers.

Finding no reversible error in the record, the judgment appealed from is

Affirmed.