**GULF OIL CORPORATION,**
Appellant,

v.

**Mrs. Eva WRIGHT and The Standard Insurance Company, Intervener,**
Appellees.

No. 15692.

United States Court of Appeals
Fifth Circuit.

Aug. 10, 1956.

Raymond A. Lynch, William L. Kerr, Midland, Tex., Turpin, Kerr & Smith, Midland, Tex., of counsel, for appellant.

John P. Dennison, Pecos, Tex., Alton C. Linne, Monahans, Tex., for appellee, Mrs. Eva Wright. Martelle McDonald, McDonald & Shafer, Odessa, Tex., for appellee, The Standard Insurance Co.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

John R. BROWN, Circuit Judge.

Wright, an employee of Zephyr Drilling Corporation, an independent contractor drilling an oil well for Gulf Oil Corporation in the West Texas area, was asphyxiated on the morning of May 9, 1953, while he and Simpson, Driller on Tour 2, were jetting out one of the pits. By verdict on a general charge, the jury found Gulf negligent on one or more of these grounds: failure to furnish safe place to work, to make tests of gaseous water flowing from the well, to warn Wright, to mud off the gas formation and ordering the continuing of drilling in the face of the known presence of gas. And, in doing so, the jury impliedly made findings favorable to the plaintiff that Wright was not contributorily negligent, did not voluntarily work in hazards known to him, that Wright was not acting as an employee of Gulf, that the defects and dangers were not those known or which should have been known to invitees and death was not caused by the sole negligence of Zephyr, his employer, or as the result of transitory conditions incident to the progress of the work.

Raised in several ways is Gulf's principal contention that there is no evidence showing that fatal injuries resulted from a violation of any duty owing by Gulf to the employees of its Contractor, especially since the danger must have been well known and of a nature which the Contractor should have guarded against, and arose during performance and long after Gulf had admittedly turned over, as lessee, a safe well site.

During [1] Tour 1 on May 8, while drilling at a depth of about 3400 feet, a heavy water flow was encountered about 3:00 or 4:00 a.m. The Driller shut down, notified the Contractor's Tool Pusher, but apparently allowed the water to continue flowing. The water had a strong sulphur odor like rotten eggs and had a tendency to make the men gag and to burn their eyes. On instructions of the Tool Pusher, drilling was resumed but between 5:30 and 7:00 a.m. when Gulf's superintendent was notified for the first time, drilling was stopped on Gulf's orders [2] to close the well in. During Tour 2, May 8, the well was tested by connecting flow lines to a test tank permitting the water to flow into the tank to determine its rate of flow. In the meantime the crew of Tour 2, under supervision of Gulf's mud engineer, began conditioning the mud to obtain a desired weight sufficient to seal off or "mud off" the water flow and fumes. The mud was not used nor was any drilling done on this Tour.

On Tour 3, May 8, water testing had been completed and the flow shut off by the blowout preventer. On instructions [3] of Gulf, drilling was resumed about 7:00 p.m. using the water flow as drilling fluid without any mud. The gaseous water was, therefore, flowing from the well through pipes into the pits. Gulf's decision to use the water flow as drilling fluid and not seal off or "mud off" this water flow and fumes was based on its desire to save the water sand for possible future testing and development as an artesian water well for water flooding recovery procedures on old oil wells in that area.

1. Operations continued around the clock in three shifts (Tours):

Tour 1  00:01 hrs. to 8:00 a.m.
Driller: Hightower

Tour 2  8:00 a.m. to 4:00 p.m.
Driller: Simpson
(Wright was in Simpson's crew)

Tour 3  4:00 p.m. to 12:00 midnight
Driller: Oliver

2. The drilling contract, a Gulf printed form but with considerable deletions, prescribed compensation at "Day Rates." It contained the usual independent contractor provision:

"19. *Independent Contractor Relationship:*

"In the performance of the work herein contemplated Contractor is an independent contractor, with the authority to control and direct the performance of the details of the work, Gulf being interested only in the results obtained. But the work contemplated herein shall meet the approval of Gulf and be subject to the general right of inspection herein provided to Gulf to secure the satisfactory completion thereof. * * * "

"*Gulf Representatives' Status:*

"The actual performance and superintendence of all work hereunder shall be by Contractor, but Gulf shall be privileged to designate a representative or representatives, who shall at all times have access to the premises for the purpose of observing tests or inspecting the work performed by Contractor, and who shall have the right of determining whether such work is being performed by Contractor in accordance with the provisions of this contract. * * * "

Concerning work on "Day Rate" it further provided:

"The term 'day rate' shall have no other meaning or significance than to designate the work for which the Contractor is to be compensated at a stipulated sum per day."

\* \* \* \* \*

"With respect to any work to be performed hereunder which is to be paid for at day rates, Gulf shall have the right to specify to Contractor the general technique to be employed by Contractor in the performance of all such work; but the actual performance and superintendence of the details of such work shall be by Contractor. * * * "

3. The contract expressly provided that drilling Mud and chemicals were to be provided by and at the expense of Gulf, and the determination of the type and characteristics of the drilling fluid was expressly left to Gulf:

"Gulf shall have the right to specify to Contractor the design of the surface mud system and control equipment, which are to be approximately as shown on drawing attached to and made a part of Exhibit 'A.' At any and all times during the drilling of this well, the drilling fluid must be of a type and of characteristics acceptable to Gulf, and Gulf shall have the right to make any tests of the drilling fluid which it deems necessary."

About 7:30 to 8:00 o'clock one of Oliver's drilling crew went out to the shale shaker where the fluid was returning back out of the well and reported that there was a strong gas odor there. Oliver passed the word to his crewmen to be careful about the gas. Drilling continued until the end of Tour 3 and when relieved by Hightower, Oliver told him that one of the men had had some trouble with the gas and warned Hightower to be careful with his crew to see that none of them got into the gas.

Tour 1, May 9, continued drilling until about 6:30 a.m. when drilling was shut down because of loss cones. In the interim the obnoxious smell continued, and one member of the crew vomited from it. While awaiting fishing tools, the men went about cleaning the pits. When Tour 2 relieved him some time prior to 8:00 a.m., Hightower warned Simpson about the men being affected by the gas and told Simpson that he had had orders not to let one man go around the pit by himself.

As Tour 2 started its work, Simpson and Wright went to take care of the pits, Simpson showing Wright what he wanted done. Although the well was shut down, the water was still flowing into the pits and had the strong odor of sulphur. Apparently they were completing the jetting of the fluid into the shale pit. Shortly, an outcry was heard, Wright and Simpson were found at the edge of the reserve pit, Simpson was re-vived but not Wright. It is uncontradicted that it was the Contractor's duty to build, care for, and clean out the pits, and this was one of Wright's regular duties.

Undercutting all other contentions by Gulf is the basic one that on this evidence a directed verdict ought to have been granted. We have concluded that this point is well taken, although, because it rests in large part on the unusual presentation of the case on *causal* relationship, justice would best be served by a remand for a new trial for full development under the applicable principles. Associates Discount Corp v. United States, 5 Cir., 200 F.2d 537; City of Ft. Worth v. United States, 5 Cir., 188 F.2d 217; M. M. Landy, Inc., v. Nicholas, 5 Cir., 221 F.2d 923.

There was no proof of any kind on the cause of death. It was, of course, stipulated that death was due to asphyxiation. Assuming that, in the light of testimony of adverse medical effect of the gases on two of the employees and the sudden collapse of Wright and Simpson on short exposure near the pit, there was enough evidence from which to infer that the gas produced the death, there was yet no proof as to its nature, that is, the *kind* of gas or the *kind* of poison it contained. To be sure, there was much assumption that from the odors smelled, the gas generally was hydrogen sulphide, but the plaintiff's theory [4] seemed to be that it

---

4. See, for example, following excerpts from appellees' brief: [page 3] "The sulphur water flowing from the hole had a strong smell which resembled the smell of rotten eggs but *these fumes* having this odor were *not dangerous*, though as the work progressed, they made working conditions unpleasant for the employees, causing them to gag and to become nauseated. * * *" [page 11] "A chemical analysis would have identified any *dangerous* gas coming from the well." [page 12] "* * * nothing occurred to make Hightower believe that conditions were other than the *usual unpleasant* reaction to the odor of *sulphur* fumes coming from the sulphur wa-ter. He did not recognize the situation as dangerous or that there was *poisonous gas* present capable of asphyxiating a person." [page 25] "The evidence clearly indicates that the obnoxious *smell* of the sulphur water that overflowed into the pits *disguised* the *presence* of any *dangerous* gas * * *" [page 29] "Though Hightower had had twenty-five years experience on drilling crews and had encountered sulphur water on many occasions and knew its characteristics * * * he did not recognize this situation as dangerous or that there was *poisonous gas* present capable of asphyxiating a person." [Italics supplied]

was not this well-known gas, but some special, new or different poisons in the gas which brought on these injurious consequences.

On this interpretation nothing but the asphyxiation appeared to establish its fatally toxic character. The poisonous gas which appellee claimed caused the death not even being identified, how can Gulf's duty to foresee its presence and toxicity be tested? How can we say that Gulf should have anticipated that it would encounter this particular gas and that, once encountered, Gulf knew that it had fatally poisonous characteristics and that others would not know this? Since this involves us in the ascertaining whether " * * * reasonable men could not possibly come to a contrary conclusion", 5 Moore's Federal Practice, § 50.02, page 2314; Banks v. Associated Indemnity Corp., 5 Cir., 161 F.2d 305, 310; Ryan Distributing Corp. v. Caley, 3 Cir., 147 F.2d 138, 140; we must, of course, consider the record in the light of the general state of knowledge which "reasonable minds" would possess.

Testing it in this approach convinces us that, on this record, there is no basis for a conclusion that this was a unique, or unknown gas, but that, on the contrary, the conclusion is inescapable that the fatal gas was the common, frequently encountered and well-known hydrogen sulphide. In this process it is evident that we must draw on general knowledge, including scientific and technical information, not to arrive at a fact conclusion that it *was* hydrogen sulphide, but to determine whether a contrary conclusion on this record can have reasonable support. Once that is determined, the consideration of this factual issue of cause, forseeability and prudence becomes a matter for jury decision on the new trial on the basis of evidence, factual and scientific, there presented.

This analysis starts with the uncontradicted evidence of the "sulphur" odor, the smell of rotten eggs, and the location of this well in West Texas. The presence of hydrogen sulphide in West Texas oil operations (drilling, transportation, refinery) has long been known as has been the acute hazard to health and life resulting from it.[5]

Its extreme hazard arises in part from the fact that while, in lower concentrations, it has the characteristic odor of rotten eggs[6] (the gas is a by-product of decomposition, putrefaction of organic matter), this is lost[7] as concentration increases and, in the meantime, continued exposure adversely affects the function of the sense[8] of smell, increases respiration and consequent inhalation of the gases producing, in turn, paralysis of the respiratory system[9] and rapid death. The gas is heavier than air,

---

5. Some indication of the widespread knowledge and concern of the industrial hazard of hydrogen sulphide is shown by readily available literature listed, post, in the Appendix. For simplicity, references herein are to the item numbers of the Appendix followed by page numbers in that publication, e. g., 11:10 refers to Item 11, Hydrogen Sulphide Poisoning in the Texas Panhandle, Big Lake, Texas, and McCamey, Texas, Oil Fields, by W. P. Yant and H. C. Fowler, Bureau of Mines Report of Investigations No. 2776, October 1926; page 10 is the table showing the medical effects on humans after exposure of indicated concentrations for specified times.

6. See Appendix:

| | |
|---|---|
| 9:1 | 13:2 |
| 20:513 | 15:f27 |
| 21:179 | 22:576 |

7. See Appendix:

| | |
|---|---|
| 16:684 | 15:f27 |
| 4:2 | f28 |
| 8:all | 16:684 |
| 9:1 | 26:1 |
| 13:4 | 28:70 |
| 14:2 | |

8. See Appendix:

| | |
|---|---|
| | 9:1 |
| | 16:684 |

and see Note 7 supra.

9. See Appendix:

| | |
|---|---|
| 10:2, 3 | 9:1, 2 |
| 4:2–5 | 11:5–10 |

and see Note 12 infra.

readily settles in low and damp places,[10] is highly soluble in water with gas being released on agitation,[11] and is so toxic that even minute concentrations are deadly.[12] The usual telltale warning of its presence, besides the rotten egg odor, is burning of eyes (conjunctivitis), irritation of the nose, throat and lungs, dizziness, gagging, shortness of breath, vomiting, and similar effects,[13] all of which were present here.

This gas in oil operations has been a killer. It has long been the object of study and investigation on a wide front with recognition by the industry [14] of its hazards [15] in Texas [16] and elsewhere and the precautions [17] necessary to avoid its awful toll. This includes drilling operations and, particularly, drilling contractors.[18]

All of this is important for the widespread knowledge of this industrial

10. See Appendix:

| | |
|---|---|
| 1:§203 | 11:2–4 |
| 5:5 | 19:84 |

11. See Appendix:

| | |
|---|---|
| 4:2 | 15:f27 |
| 9:1 | f28 |
| 19:84 | 10:2 |

12. See Appendix:

20 parts per million (PPM) is the maximum which can be tolerated for long periods (not exceeding 8 hours)

300 to 400 PPM: Dangerous excess 30 minutes (not exceeding 1 to 4 hours)

500 PPM: Fatal in 30 minutes

| | |
|---|---|
| 4:2 to 5 | 21:180, 231 |
| 9:1, 2 | 22:578, 579 |
| 10:2, 3 | 16:686–689 |
| 11:10 | 28:5, 6, 49, 60–63, 66 to 75 . |
| 19:9, 85, 86 | 13:11 |
| 26:1, 2 | |

13. See notes 9 and 12, supra.

14. See Appendix:

| | | |
|---|---|---|
| 29:1 | 11:1 | 31:§106 |
| 30:152 | 13:1, 2 | 2:all |
| 33:1 | 14:1 | 3:1, 2 |
| 1:§203 | 26:1, 2 | 5:4, 5, 6 |
| 4:2 | 28:1, 5, 17, 50–57, 59 | 10:2 |
| 6:59 | 29:1 | 12:60 |
| | | 32:22 |

15. See Appendix:

| | |
|---|---|
| 1:§203 | 11:6–8 |
| 2:all | 12:60 |
| 6:59 | 13:4 |
| 7:36, 65 | 28:1 |
| 8:all | 29:1, 3, 8 to 15 |
| 9:1 | 30:152 |
| 10:all | 32:22 |

16. See Appendix:

| | |
|---|---|
| 4:3, 4 | 23:153 |
| 10:2 | 29:9–15 |
| 11:all | 30:152 |
| 13:1–4 | |

17. See Appendix:

| | | | |
|---|---|---|---|
| 1:§203 | 6:59 | 11:12–17 | 24:1.20–1.21 |
| 2:20–21 | 8:all | 13:11, 12 | 26:all |
| 4:6–7 | 9:3 to 12 | 16:689, 690 | 28:50 to 57, 80 to 102 |
| 5:4–7 | 10:4, 5 | 23:153 | 31:§106 |
| | | | 27:all |

18. See Appendix:

6:59

hazard has, or may have, a marked effect on the standard of care under Texas law. At the outset, Gulf's obligation is to be measured under the conditions of May 8 and 9 for once the well was shut down by Gulf's order early on May 8, it was its decision thereafter to proceed. Whether to drill on, to use mud, or the water flow for drilling fluid, was a decision it reserved to itself by the contract. The act was thus Gulf's, Sun Oil Co. v. Pierce, 5 Cir. (Texas), 224 F.2d 580; United Production Corp. v. Chesser, 5 Cir. (Texas), 107 F.2d 850, prior opinions 95 F.2d 521, 94 F.2d 790; Amacker v. Skelly Oil Co., 5 Cir. (Texas), 132 F.2d 431, not the contractor's, Holt v. Texas-New Mexico Pipeline Co., 5 Cir. (Texas), 145 F.2d 862; Carroll v. Magnolia Petroleum Co., 5 Cir. (Texas), 223 F.2d 657, or a casual transitory condition from the normal progress of the work, Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172, 177; Amacker v. Skelly Oil Co., supra.

But control and responsibility for the decision did not, of itself, make operations thereafter Gulf's with Zephyr's employees becoming the momentary borrowed servants of Gulf, Gipson v. Skelly Oil Co., 5 Cir. (Texas), 152 F.2d 588, 590, second appeal, 140 F.2d 21, first appeal Amacker v. Skelly Oil Co., supra, for Gulf's *act* was confined to the order to proceed with drilling using the water flow as drilling fluid. It did not have or claim the right to control Zephyr in *how* that drilling was to be conducted, Standard Insurance Co. v. McKee, 146 Tex. 183, 205 S.W.2d 362, and, in any event, at the time of injury and death no drilling was in fact in progress. What was being done was routine contractor's work in cleaning out pits. Consequently, the Texas Workmen's Compensation Act, Vernon's Ann. Civ.St. art. 8306 et seq., did not apply to cut off common law liability, Dennis v. Mabee, 5 Cir. (Texas), 139 F.2d 941, certiorari denied 322 U.S. 750, 64 S.Ct. 1261, 88 L.Ed. 1581; nor did Zephyr's agreement [19] to maintain compensation insurance for its own employees operate [20] to make them thus the employees of Gulf or deprive them (or their beneficiaries) of their actual status *vis-a-vis* Gulf.

But responsibility for initiating the act does not of itself impose a legal liability on Gulf for its consequences any more than for an injury to a Contractor's employee during routine operations, all of which are, of course, pursuant to its general contractual direction and for which the Contractor is normally alone liable. Texas Electric Service Co. v. Holt, Tex.Civ.App., 249 S.W.2d 662, NRE; Humble Oil & Refining Co. v. Bell, Tex. Civ.App., 180 S.W.2d 970, error refused on other grounds, 142 Tex. 645, 181 S.W. 2d 569. And liability under the guise of negligence cannot be saddled on Gulf for its decision not to mud off the water flow. This was Gulf's property. Neither the Contractor nor its employees could forbid development of the property as Gulf saw fit. It may be that, having determined to preserve the water sand for oil well recovery use, Gulf had to take special or extraordinary precautions. But neither such decision nor the act standing alone can be a violation of duty, i. e., negligence.

This reduces it to the nature of the duties owed, if any, once its decision was reached and communicated to proceed

19. The drilling contract provided:
   "16. *Insurance:*
   "Contractor agrees to carry with an insurance company satisfactory to Gulf, and authorized to do business in the State of Texas, the following insurance: Workmen's Compensation Insurance, covering all of Contractor's employees, and all employees of any Sub-Contractor engaged in the work to be performed hereunder * * *. Certificates of insurance coverages shall be furnished Gulf before work under this contract is begun."

20. The cases of Lindsey v. Texas & N. O. R. Co., Tex.Civ.App., 87 S.W.2d 864, and Southern Underwriters v. Lloyds America, Tex.Civ.App., 133 S.W.2d 151, error dismissed, judgment correct, are not to the contrary. The first was a suit against the Railroad on the *theory* of master-servant; the second, was a claim under the Texas Compensation Act against a common compensation insurer whose policy was intended to cover and be for the benefit of both Owner and Contractor.

with the drilling. The relationship under Texas law between an occupier of land and his invitees (including employees of an independent contractor) and between a general contractor and· employees of subcontractors is the same, Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99; Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853, and gives rise to a like duty, "Accepting * * * the status of the plaintiff * * * as that of business invitee, the defendant owed him a duty to use reasonable care to make and keep the premises reasonably safe for his use * * *", Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60, 62; Hall v. Medical Building of Houston, 151 Tex. 425, 251 S.W.2d 497; Smith v. Henger, supra; Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609; Weingarten, Inc., v. Brockman, 134 Tex. 451, 135 S.W.2d 698; McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 393; and which, whether it involves primarily the condition of premises, or a chattel supplied for use, or, more comparable here, for work in or around dangerous things, the manufacture, sale or supplying of dangerous articles, brings into application the underlying standard of the Restatement of Law [21] that a duty arises if, but only if, the occupier,[22] supplier,[23] or manufacturer [24] has reason to expect that those likely to come in contact with it will not know of the danger.

This measures it upon the objective standard of what the defendant could reasonably expect [25] others to know. The duty is " * * * to warn such persons of the existence of dangers which could not reasonably be *expected* to be apparent or obvious * * *, Restatement, Torts, § 343", Smith v. Henger, supra at 226 S.W.2d 425, 431. Liability does not exist for defects " ' * * * which are *not* of

21. Texas courts have many times quoted with approval from the Restatement: see, S. Blickman, Inc., v. Chilton, Tex. Civ.App., 114 S.W.2d 646; McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442; Kimbriel Produce Co. v. Mayo, Tex.Civ.App., 180 S.W.2d 504; Horne Motors v. Latimer, Tex.Civ.App., 148 S.W.2d 1000; Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374; Standard Insurance Co. v. McKee, supra.

22. Restatement of the Law, Torts, § 343: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he

"(a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and

"(b) has *no reason* to *believe* that they will discover the condition or realize the risk involved therein, * * *" [Italics supplied]

Section 343 has been cited with approval in Smith v. Henger, supra, Houston National Bank v. Adair, supra.

23. Section 388, Torts: "One who supplies * * * a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied;

"(b) and has *no reason* to *believe* that those for whose use the chattel is supplied will *realize* its dangerous condition; and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." [Italics supplied]

Cited with approval Kirby Lumber Co. v. Murphy, Tex.Civ.App., 271 S.W.2d 672; and see, Roosth & Genecov Production Co. v. White, supra, citing Section 392 which incorporates Section 388 by reference.

24. Torts, Section 394: "The manufacturer of a chattel, which he knows to be, or to be likely to be, dangerous for use, is subject to liability as stated in §§ 388 to 390."

Section 399: "A vendor of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be dangerous, is subject to liability as stated in §§ 388 to 390."

25. Justice Calvert, McKee v. Patterson, supra, refers to Dean Keeton's Article 100 Pa.Law Review 629–648.

such a character that danger is reasonably to be *anticipated* from them to persons exercising ordinary care' ", A. C. Burton Co. v. Stasny, Tex.Civ.App., 223 S.W.2d 310, 313, error refused; but it may exist where invitees " * * * would not be *expected* to be fully aware of its use or dangers * * * ", Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154 S.W.2d 625, 629; Houston National Bank v. Adair, supra. It is, or may be, akin to dangers which are (or ought to be) open and obvious and as to which no duty is owed, McKee v. Patterson, supra; Fain v. Goodyear Tire & Rubber Co., Inc., 5 Cir. (Texas), 228 F.2d 508; Phillips Petroleum Co. v. Gibson, 5 Cir. (Texas), 232 F.2d 13, but in many situations it is, or may be, much different. For example, a can of gasoline, properly labeled may not be an open and obvious hazard from its general appearance and yet, despite its destructive capacity, a supplier has no liability for misuse by a user since, at this late date, it is *expected* that the dangers will be known, i. e., understood, appreciated. Cf. Waters-Pierce Oil Co. v. Davis, 24 Tex.Civ.App. 508, 60 S.W. 453; Texas Drug Company v. Cadwell, Tex. Civ.App., 237 S.W. 968, writ refused; Liggett & Meyers Tobacco Co. v. Wallace, Tex.Civ.App., 69 S.W.2d 857, writ dismissed.

This emphasizes the necessity for the proof identifying to some reasonable degree the nature of the toxic gas. For only by identification can there be a rational test of what the defendant ought reasonably to have expected others to know. This was a part of the plaintiff's affirmative case, McKee v. Patterson, supra. And since, on the record so far presented, reasonable minds could only conclude that this was hydrogen sulphide gas, it is evident that a substantial issue was presented but on which no proof was offered. More specifically, it was (and will be): in view of the indicated widespread knowledge of the nature of hydrogen sulphide, its occurrence in drilling operations, the warning signs of its presence, and its toxic qualities, would a reasonably prudent mineral lessee reasonably expect [26] that drilling contractors and their employees working around a drilling well in the West Texas area would know of its dangers and hazards? If so, no duty exists to warn or protect. If not, then a duty might exist unless, as to the particular plaintiff, he knew or ought to have known of the risk and imprudently or voluntarily exposed himself to it. McKee v. Patterson, supra. Naturally, if it is some other gas, these same inquiries must be made as to it.

Obviously we express no views on what the evidence if any, will be on the retrial. Whether, and to what extent, it then presents a case for jury action under the principles here discussed is a matter for the trial judge upon that trial and its full development of *all* of the issues anew.

Reversed and remanded.

HUTCHESON, Chief Judge, specially concurring.

RIVES, Circuit Judge, dissenting.

### Appendix

1. American Petroleum Institute [API] draft of revision of Accident Prevention Manual No. 10, Rotary Drilling, December 1951.

2. Air Pollution by Hydrogen Sulphide in Poza Rica, Mexico, an evaluation of the instant of November 24, 1950, by Lewis C. McCabe, Chief, Fuels & Explo-

26. The parties recognized that there were definite risks and hazards in the proposed drilling and at least as to those a prudent owner would expect to be known, the contract put the responsibility on the contractor for safety:

"8. *Safety Precautions:*

"Contractor shall provide and have available at all times for use by Contractor's employees engaged in the performance of the work herein undertaken, all safety appliances needed for the maximum protection of Contractor's employees against injuries."

The schedule specifically required the contractor to provide:

"N. Safety devices, including fire proof stove, fire proof lighting, water injection equipment on motor exhausts, gas masks, and any other safety appliances necessary for prevention of fire or explosion and protection of workmen."

sives Division, Bureau of Mines, United States Department of Interior, and George D. Clayton, Chief, Atmospheric Pollution Unit Division of Occupational Health, United States Public Health Service, Federal Security Agency, Bureau of Mines, United States Department of Interior and United States Public Health Service, Federal Security Agency, 1951.

3. Atmospheric Pollution Control in Petroleum Refineries, Lewis J. Cralley, Senior Scientist, United States Public Health Service, American Industrial Hygiene Association Quarterly Volume 11, page 1, May 1950.

4. Hydrogen Sulphide Poisoning as a Hazard in the Production of Oil by Sara Davenport, United States Bureau of Mines Information Circular 7329, July 1945.

5. Method of Handling Hydrogen Sulphide Gas in the Elk Basin Oil Field of Wyoming, Bureau of Mines Information Circular 7334, October 1945, by J. H. East, Jr., and Ralph H. Espach.

6. Rotary Drilling Handbook on Accident Prevention and Safe Operating Practices, American Association of Oil Well Drilling Contractors, June 1950.

7. Safety Manual, Production Department, Humble Oil & Refining Company, May 1953.

8. Safety Instruction Card No. 540, Hydrogen Sulphide, National Safety Council.

9. Petroleum Safety Data, American Petroleum Institute, No. 7, July 1951, Handling Crude Oils containing Hydrogen Sulphide (H2S) Gas.

10. API Toxicological Review, Hydrogen Sulphide, 1948, American Petroleum Institute.

11. Hydrogen Sulphide Poisoning in the Texas Panhandle, Big Lake, Texas, and McCamey, Texas Oil Fields, by W. P. Yant and H. C. Fowler, Bureau of Mines Report of Investigations No. 2776, October 1926.

12. Occupation Hazards and Diagnostic Signs, Bulletin No. 41, Division of Labor Standards, Department of Labor, 1942.

13. Hydrogen Sulphide Poisoning in Texas by C. M. Aves, M. D., reprinted from Texas State Journal of Medicine, March 1929.

14. The Causes and Prevention of Hydrogen Sulphide Poisoning, Industrial Health Series No. 19, U. S. Department of Labor, Division of Labor Standards, 1940.

15. Industrial Safety and Health Handbook, Manufacturers Directory Company, 1952.

16. Hydrogen Sulphide: Its Toxicity and Potential Dangers, Division of Industrial Hygiene, U. S. Public Health Service, Public Health Reports Volume 56, page 684, April 4, 1941.

17. The Determination of Low Concentrations of Hydrogen Sulphide in Gas by the Methylene Blue Method, Bureau of Mines, Report of Investigations 4547, September 1949.

18. Removal of Hydrogen Sulphide and Carbon Dioxide from Synthesis Gas Using DI and TRI-Ethanolamine, Bureau of Mines, Report of Investigations 4891, October 1952.

19. Industrial Toxicology by Lawrence Fairhall, Scientist Director Public Health Service, Federal Security Agency, Williams and Wilkins Company, 1949.

20. Legal Medicine Pathology and Toxicology by Gonzales, Vance, Helpern, all MD's, and Umgerger, PHD, Appleton-Century-Crofts, New York, 1954.

21. Occupational Medicine & Industrial Hygiene, Rutherford Johnstone, MD, Consultant in Industrial Health; Lecturer at University of California, Los Angeles, C. V. Mosby Company, 1948.

22. Legal Medicine & Toxicology by Ralph Webster, MD, PHD, Professor of Medicine, University of Chicago, W. B. Saunders Company, 1930.

23. Safety in Petroleum Refining and Related Industries by George Armistead, Jr., 1949, John G. Simmonds & Co., Inc., Oil Insurance Underwriters, New York.

24. Mine Safety Appliances Company, Catalogue of Industrial Safety Equipment, Catalogue 7B, 1953.

25. An Apparatus for the Determination of Hydrogen Sulphide in Gases, Horne & Shirey, Bureau of Mines, Report of Investigations 3135, October 1931.

26. A Detector for Quantitative Estimation of Low Concentrations of Hydrogen Sulphide by Littlefield, Yant and Berger, Bureau of Mines, Report of Investigations 3276, June 1935.

27. Comparison of Gas Masks, Hose Masks, and Oxygen Breathing Apparatus by S. H. Katz and J. J. Bourquin, Bureau of Mines, Report of Investigations No. 2489, June 1923.

28. Investigation of Toxic Gases from Mexican and Other High-Sulphur Petroleums And Products, Report by the Bureau of Mines, Department of Interior, to the American Petroleum Institute by Sayers, Smith, Fieldner, Mitchell, Jones, Yant, Stark, Katz, Bloomfield, and Jacobs, Bureau of Mines Bulletin 231, 1925.

29. Hydrogen Sulphide Content of the Gas in Some Producing Oil Fields by Devine & Wilhelm, Bureau of Mines Report of Investigations No. 3128, September 1931.

30. Hydrogen Sulphide Gas Peril in Panhandle and Permian Basin by V. H. Hayslip, Humble Oil & Refining Company, Oil & Gas Journal Volume 27, No. 40, at page 152, February 21, 1929.

31. Safe Practices in Drilling Operations, American Petroleum Institute, Accident Prevention Manual No. 10, 2nd Edition, 1953.

32. Hazards of Hydrogen Sulphide, Safety Information, August 1942, page 22, published by Humble Oil & Refining Co.

33. The Use of Lime in a Salt Solution for Removing Hydrogen Sulphide from Natural Gas, Bureau of Mines, Report of Investigations 3178, June 1932.

HUTCHESON, Chief Judge (specially concurring).

This is another of the ever increasing confused and confusing suits for damages brought, by a covered and fully compensated employee of an independent contractor, against a compensation carrying employer of the contractor. It was brought on allegations [1] which if proven would, under the principles laid down in the controlling Texas decision,[2] make the decedent, as to the work or a part of it, not an employee of an independent contractor but of the defendant itself, and would, therefore, under the Texas Workmen's Compensation Act, prevent the recovery sought.[3] It was, however, tried and submitted below and presented and argued here, on the theory: that plaintiff's employer was an independent contractor of a third party, an oil company, which had invited plaintiff and his employer to come upon its premises for the purpose of drilling an oil well; that it had retained control of the premises and the work being done there; and that under Sunray Oil Corp. v. Allbritton, 5 Cir., 187 F.2d 475, 476,[4] where the defendant

---

1. "That the said defendant, Gulf Oil Corporation, entered into a contract with the Zephyr Drilling Company whereby the said Zephyr Drilling Company was drilling said well on a day to day basis with the said Gulf Oil Corporation, and that the said Zephyr Drilling Company was drilling said well under the immediate supervision, control, and direction of said Gulf Oil Corporation, its agents, servants and employees.

    * * *

    That said employees of the said Gulf Oil Corporation were also kept on said job for the purpose of supervising, directing and controlling the activities of the said Zephyr Drilling Company in connection with the drilling of said well. * * * *"

2. Standard Insurance Co. v. McKee, 146 Tex. 183, 205 S.W.2d 362, and cases cited at page 364.

3. Lindsey v. Texas & N. O. R. Co., Tex.Civ. App., 87 S.W.2d 864; Southern Underwriters v. Lloyds America, Tex.Civ.App., 133 S.W.2d 151; Martin v. Consolidated Cas. Ins. Co., 5 Cir., 138 F.2d 896. Cf. Skelly Oil Co. v. Amacker, 5 Cir., 140 F. 2d 21; Gipson v. Skelly Oil Co., 5 Cir., 152 F.2d 588; Dennis v. Mabee, 5 Cir., 139 F.2d 941; Bell v. Humble Oil & Refining Co., 142 Tex. 645, 181 S.W.2d 569.

4. There it was said:
    "We agree with the lower court's holding: that, if Sunray retained con-

had furnished a derrick for use by the contractor, and the cases on which it rests, it owed plaintiff, as an invitee, the duty to exercise reasonable care not only to deliver the premises in safe condition for use but to maintain them in that condition.

As I see it, the case was tried below, without developing a single contradiction in the evidence or furnishing a single shred of evidence that Gulf had retained or exercised any control over the premises or the work, and upon undisputed facts showing: that the work was contracted to and performed by Zephyr as an independent contractor under a contract containing no reservation by defendant of any control over the premises or the work; and that the defendant did not exercise or attempt to exercise any, Standard Insurance Co. v. McKee, note 2 supra. At its ending, it presented the simple single question of law, whether, in violation of a duty owed by it to plaintiff's decedent, the breach of which would support a verdict and judgment for plaintiff, the defendant had done anything it ought not to have done or left undone anything it ought to have done.

The defendant, of the view that as matter of law no duty and, therefore, no breach of duty was shown, moved for an instructed verdict, and, the motion denied, requested charges, some of which were given and some refused.

To the refusal of its motion for a directed verdict and to the giving of excepted to instructions and the refusal of those it requested, defendant duly excepted, and a verdict having been returned against it, and the judgment entered thereon, it came here presenting many grounds of error. The principal and most argued of these is its contention: that defendant was entitled to a directed verdict; and that, because of the district judge's refusal to direct such a verdict, the judgment should be reversed and here rendered.

In the alternative, it insists that if wrong in this, the judgment should be reversed and the cause remanded for trial anew because of the errors in the giving and refusal of charges.

I am of the opinion that, as to some of the charges given and refused, the court committed error, as claimed by the appellant. Because, however, I am of the further opinion that as matter of law no basis for a judgment against defendant was, or can be shown, I will not discuss these errors, but will devote what I have to say to stating with all possible brevity my reasons for believing with Judge Brown that the motion for a directed verdict should have been granted.

I agree with his view that an instructed verdict should have been given and that the judgment must be reversed for failure to give it, and, though I believe that the cause has been fully developed and nothing can be accomplished thereby, I am willing to join with him in remanding for retrial instead of here rendering. As to his opinion, therefore, I will content myself with saying that I agree in general with its statement of the facts and with so much of what is said arguendo as is not in conflict with the views I herein espouse.

Before proceeding to a discussion of the conclusions in Judge Rives' dissent, I think it proper to point to and correct two misapprehensions of fact under which he appears to be laboring.

One of these has to do with the testimony of N. W. Eaton, Zephyr's drilling superintendent, set out in note 8 of the opinion in support of the statement "Zephyr relied on Gulf for any chemical tests of the gas." [236 F.2d 59] As will be seen by reference to the question just preceding the one with which note 8 begins, the testimony quoted in the note had no reference to testing gases of the kind involved in this suit. The question referred entirely to "oil bearing strata or gas bearing strata, formations that contained gas or oil". They had to do not with testing for dangerous gases but for the testing of producing horizons for the presence of gas and oil.

trol over the premises and the derrick, it was bound to exercise reasonable care to maintain the derrick in safe condition for use".

The second misapprehension appears in the statement of the dissent [236 F.2d 61]:

> "Wright was a young man, only 22 years of age. His youth and inexperience must have been observable by Gulf's men on the job, and they must have known that, like most other young men in these days, the early part of his manhood had been spent in military service, in his case in the Navy."

That this is a misapprehension of the record is shown by the fact that instead of pleading and proving that Wright was inexperienced, the petition alleged that Wright *"was a young man 23 years of age, strong and healthy, and was trained and being trained in the occupation of an oilfield roughneck as well as other duties in connection with the drilling and exploration of oil wells"*; (emphasis supplied) and the testimony of his mother that he spent one year, the fall of 1948 to the fall of 1949, in the Navy and shortly after his discharge and the death of his father, he got a job in the oil field and worked steadily first as a roughneck and later as a derrick man, working there altogether three and one-half years.

As to the conclusion reached in the dissent, it seems to me, with deference, to be based upon an approach which the record does not bear out, which indeed appellees do not espouse, and which, if maintained, would defeat plaintiff's recovery completely on the ground that at the time of the injury the work was not being done under an independent contract, Standard Insurance Co. v. McKee, supra, and the cases cited in note 3, and the defendant was not a third person under the compensation laws of Texas.

At the beginning of his opinion, Judge Rives stating, "Gulf exercised a large measure of control over the drilling of its well", quotes from Alford, Gulf's superintendent, "'I had charge of the drilling.'" By contrast the appellees correctly state in their brief, "Pursuant to a contract with Gulf, as an independent contractor, Zephyr began drilling a well", etc. Of course, if Judge Rives is right that Gulf had control over the drilling of the well, then, as settled by the authorities, note 3 supra, plaintiff's suit against it as a third party must fail.

Beginning with the statement above which, if correct, would put Gulf in the attitude of an employer, the dissenting opinion then, as I think, dealing with the matter incorrectly as though this were a suit against an employer, and, on the incorrect assumption that Gulf was in control of the premises and the drilling of the well, decides the case upon assumptions: (1) that Gulf owed plaintiff the duty to exercise due care in furnishing him a safe place to work; and (2) that it did not discharge this duty, which I think it clear the record, as a matter of fact and law, does not support. Gulf was not the employer, Zephyr was, and Zephyr's liability as an employer was absolute, established and satisfied under the Texas Workmen's Compensation Law. Neither, since Gulf did not retain control over the premises or the work, was it under any duty of care to maintain the premises in a safe condition, that duty was Zephyr's.

In my opinion, the case for our decision is a very simple one under the rule laid down and applied without varying in the cases.[5] This rule is that, in order for an owner which has entered into an independent drilling contract for the drilling of an oil well to be held liable for conditions arising after the work is entered upon and as a result of its being done, it must be shown that the owner retained control over the premises and the operations and therefore owed a duty of due care as to maintaining a safe

---

5. Smith v. Henger, 148 Tex. 456, 226 S. W.2d 425, 20 A.L.R.2d 853; Texas Electric Service Co. v. Holt, Tex.Civ.App., 249 S.W.2d 662; McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391; Union Tank & Supply Co. v. Kelley, 5 Cir., 167 F.2d 811; Sunray Oil Corp. v. Allbritton, 5 Cir., 187 F.2d 475, 476; Thompson v. Rowan Drilling Co., 5 Cir., 197 F.2d 32; Cagle v. McQueen, 5 Cir., 200 F.2d 186; Carroll v. Magnolia Petroleum Co., 5 Cir., 223 F.2d 657.

place, or that, by positively negligent action, it caused the injury.

The undisputed facts in this case are: (1) that Gulf employed Zephyr to drill a well under an independent contract; (2) that it required Zephyr to take out workmen's compensation insurance to cover men employed by it; (3) that it retained no control over the premises or the drilling of the well, or safety precautions to be taken in connection with its drilling; (4) that it did no positive act or thing which proximately contributed to the injury; and (5) that it did nothing to put itself in a position under settled Texas law which would make it liable as employer as to any part of the work that was being done by the independent contractor. Standard Insurance Co. v. McKee and cases, supra.

The matter standing thus, there was no basis for a finding that the defendant breached any duty it owed plaintiff, none for a judgment against it.

In addition, if I am mistaken in this view and there is proof that the Gulf Company did take over control of the work, it seems clear to me, under the doctrine that one entrusting work to an independent contractor may retain such control over the doing of a part of the work as to create the relation of master and servant respecting such part, that under settled law plaintiff would have been an employee of defendant, and under the Texas Workmen's Compensation Act would not be entitled to recover. This is flatly held in the cases cited in note 1, supra, and no cases are cited to the contrary.

In conclusion, it seems clear to me that out of a simple case, which on undisputed evidence, presented these three questions: (1) Was Zephyr an independent contractor? (2) Did Gulf retain control over the premises and the work? and (3) If it did, did it become plaintiff's employer?; a case of great difficulty and confusion has been confected. As I see it, the evidence leaves in no doubt that Zephyr was an independent contractor, indeed nobody contends to the contrary. There is no evidence, direct or indirect, that Gulf retained such control over the premises as, under Sunray Oil Corp. v. Allbritton, supra, and similar cases, would put a duty upon it to exercise reasonable care in regard to the conduct of the drilling which it had independently contracted out. If I am wrong in this, it is because, and only because, the evidence established facts showing that, as pleaded by plaintiff, Gulf Company was plaintiff's employer, and this, if shown, would defeat plaintiff's suit.

Of the clear opinion that the judgment should be reversed and rendered, I nevertheless concur in a judgment of reversal and remand.

RIVES, Circuit Judge (dissenting).

I think that the judgment should be affirmed. Gulf exercised a large measure of control over the drilling of its well. William C. Alford was its "Area Drilling Superintendent" and testified: "I had charge of the drilling." He was at the well until between 7:30 and 8:30 on the night before Wright's death, and when he left he did not consider the situation as to gas dangerous.[1] He had had forty-one years of experience in this line of work with this same company. It was he who gave the order to use the sulphur water as drilling fluid.[2] He made no

---

1. "Q. And at the time when you left there was there anything there that caused you to believe that there was gas or possibilities of gas in any concentrations which might be dangerous to people that might be around the rig? A. Not at that time, no, sir.

"Q. I see. Well, did you ever believe or have anyone tell you that before Mr. Wright became involved in his accident? A. No, sir."

2. "Q. Mr. Alford, didn't you give the order yourself to go ahead and drill using the sulphur water for the drilling fluid in that well? A. To go ahead using the water that was flowing and go ahead drilling.

"Q. That was your order? A. That's right."

effort to find whether that sulphur water was dangerous.[3]

On the day before Wright's death, K. W. Grebe, Gulf's "Petroleum Engineer", collected several one gallon test samples of the water for chemical analysis. Even then, however, he did not think that the gas was dangerous,[4] and did not warn the drilling crew.

R. A. Spears, Gulf's "Drilling Foreman", was at this well "for a period of four or five hours, I'd say" on the day preceding Wright's death. Though he had been in that same work with Gulf for thirty years, he recognized no danger.[5]

Ratliff Lepley was another "Drilling Foreman" for Gulf who stayed at this well constantly. He had been in Gulf's employ for 28 years. He smelled the odor but never gave a thought to any danger.[6]

N. W. Eaton, "Drilling Superintendent" for Zephyr, was at the location between 8:00 and 10:00 o'clock on the night before Wright's death. He did not think the gas was then of sufficient concentration to be dangerous.[7] He had had experience in drilling oil wells since 1933. Zephyr relied on Gulf for any chemical tests of the gas.[8]

3. "Q. Now, is it your statement that you didn't ask that any chemical analysis be made to determine what gas was there and whether it was dangerous to those people or not? A. No, sir, I did not."

4. "Q. And when you took the samples did you consider that there was gas there, that you were in danger as you were taking the samples? A. In my own mind I felt that there was some gas present but I was not aware of the fact that it was dangerous."

5. "Q. Well, was there anything about the odor, the concentration that you saw there, that caused you to believe that there was any danger about being around it? A. No, sir. Previously before I had situations, you see water that smelled like that to come from the wells."

6. "Q. What, if anything, could you tell about the water, could you smell anything? A. Yes, sir. I could smell, it had an odor.

"Q. Now, how close did you get around the places where the water was being run or stored? A. I was all around it, right up at it.

"Q. While you were around it and up at it did it appear to you that the thing that was causing the odor, whatever was in the water, was of sufficient concentration to be dangerous to you or anybody else? A. No, sir. In fact, I never even give it a thought. We never thought about it.

"Q. In your drilling experience during the years was that the first time that you had even encountered water in an oil well? A. Oh, no, sir. We do that every once in a while.

"Q. Is it frequent or infrequent in

the drilling of wildcat wells that you run into water denominated sulphur water? A. Well, you run into that every once in a while, yes, sir.

"Q. Ordinarily, running into sulphur water, do you ever connect that with having gas that might asphyxiate those that get it in sufficient quantity? A. No, sir. Never have."

7. "Q. Well, when you left there did you consider that there was gas in concentration sufficient to make it dangerous for your crew men to be there working on the floor? A. No, sir.

"Q. Or about the premises? A. No. I wouldn't think so, no."

8. "Q. Yes. Whenever you ran into anything in the way of oil or gas they would run their own test on what you had found to determine what it was, wouldn't they? A. I don't believe I quite get you on that.

"Q. Well, let me point it out to you. You entered into a contract with them, did you not, sir, about how this well was to be drilled? A. That's right.

"Q. And in that contract didn't it state that the contractor agreed to stop drilling and to notify Gulf whenever any oil or gas bearing formations were found so as to give Gulf opportunity in sufficient time to examine said formation for the purpose of determining what further operations, if any, should be conducted? A. Well, I don't know. I believe that the Gulf advised us about those things because they had capable men who were capable of identifying those formations which a drilling crew is not responsible for doing.

"Q. Well— A. Does that answer your question?

W. H. Fort, "Tool Pusher" for Zephyr and a man with eighteen or twenty years' experience in oil field work, had not recognized the danger.[9] He had heard of tests for poisonous gas.[10]

That a chemical analysis would have revealed whether the hydrogen sulphide was of sufficient concentration to be deadly was also proved by the testimony of K. W. Grebe, Gulf's "Petroleum Engineer", who had collected the samples of water on the day preceding Wright's death.[11]

Under this factual situation, it seems to me that the controlling Texas law is well stated in Robert E. McKee, General Contractor, Inc., v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 395:

"In all such cases, knowledge of the existence of the condition and appreciation of the danger therein by the parties are important factors in determining liability, but the rule for determining whether the parties should have known of the condition and appreciated its danger is not always the same as to each. The owner is charged with knowledge of any dangerous condition that a reasonable inspection would have revealed because his duty to keep his premises in a reasonably safe condition for use by his invitees includes a duty to inspect. Smith v. Henger, supra [148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853]; R. E. Cox Dry Goods Co. v. Kellog, Tex.Civ. App., 145 S.W.2d 675, writ refused. There is no such obligation on the invitee. Peck v. Peck, 99 Tex. 10, 87 S.W. 248; Triangle Motors of Dallas v. Richmond, [152 Tex. 354] 258 S. W.2d 60, 63. While he may not close his eyes to obvious dangers, he has a right to assume that the premises are safe for his use. Blanks v. Southland Hotel, Inc., 149 Tex. 139,

---

"Q. Yes. That's what I am driving at. They would rely on their own tests? A. I understood you to say that 'they done the testing. We do the testing as far as the equipment is concerned and the labor.

"Q. Oh, yes, I see what you mean. But after you got out of the well the samples that they wanted you didn't conduct any test to determine the chemical content of those samples? A. Oh, no, sir.

"Q. You turn them over to Gulf and they rely on their own information about that? A. That's right, yes, sir.

"Q. Now then, you didn't have any facilities there for any chemical analysis of any sort, did you? A. No.

"Q. Just nothing but doing the mechanical work and labor to drill that hole? A. That's right."

9. "Q. Now, did you see anything or smell anything from that water flow into the reserve pit as to cause you to believe that it would be dangerous for your workmen to be about where this water was flowing? A. Well, there just nobody ever had any indication of being gas or anything in it.

"Q. Well, did you believe it was dangerous for your workmen to be working there? A. I don't think so.

\* \* \* \* \*

"Q. Well, was the gas there in sufficient quantities when you last was there in your opinion to be dangerous to your workmen? A. Well, I didn't think so."

10. "Q. Well, you had heard that people do have men out there testing the gas to see whether it is poison gas or not as it flows in the reserve pits? A. Yes."

11. "Q. Now then, what kind of gas do you think it was out there that caused William Wright's death? What is the nature of it, chemical nature of it? A. Well, as I said, I did not run or execute any chemical analysis on this water, but from the smell of it I assumed that it was hydrogen sulphide, though I could not be positive, of course.

"Q. That can be very poisonous, of course, can it not? A. Yes, sir.

"Q. And you can determine the extent to which it is poisonous by such chemical analysis, can you not, Mr. Grebe? A. Yes, sir, but I believe that there would be lots of other factors that would determine its deadliness, so to speak, its concentration.

"Q. I know. But by chemical analysis you can determine whether it is that kind of gas that would kill people no matter what that concentration might be, you can find out what that chemical content would be, can't you? A. Yes, sir. I would say so."

229 S.W.2d 357, 360; Triangle Motors of Dallas v. Richmond, supra; Restatement of Torts, Vol. 2, Secs. 343a and 343d.

"In order to fix liability on the owner it must first be established that he knew or should have known of the existence of the condition and that he should have appreciated its dangers. Once this is established either as a matter of law or by a fact finding, the inquiry then turns to what was known and appreciated, or should have been known and appreciated, by the invitee. In some cases, the existence of the condition may be so open and obvious and the dangers inherent in it so apparent that we may say as a matter of law that the invitee should have known of and appreciated them. Houston National Bank v. Adair, 146 Tex. 387, 207 S. W.2d 374; Marshall v. San Jacinto Bldg., Tex.Civ.App., 67 S.W.2d 372, writ refused; A. C. Burton Co. v. Stasny, Tex.Civ.App., 223 S.W.2d 310, writ refused; United Gas Corp. v. Crawford, 141 Tex. 332, 172 S.W. 2d 297. In others, whether the condition was so open and obvious and the dangers in it so apparent that the invitee should have known of them may be fact questions. Triangle Motors of Dallas v. Richmond, [152 Tex. 354] 258 S.W.2d 60; Hall v. Medical Bldg. of Houston, 151 Tex. 425, 251 S.W.2d 497; Blanks v. Southland Hotel, 149 Tex. 139, 229 S.W.2d 357."

Mr. Grebe's testimony heretofore quoted (footnote 11, *supra)* would indicate that hydrogen sulphide was the poisonous gas that caused Wright's death. All of the circumstances point to the same conclusion. While appellee's brief contains some ambiguous statements (footnote 4, majority opinion), I can find no suggestion in the record of the presence of any poisonous gas other than hydrogen sul-phide. Certainly it was present, and just as certainly in sufficient concentration it is deadly. It was stipulated that Wright's tour of duty started at 8:00 A. M. on May 9, 1953. Within thirty minutes, by 8:30 A. M., he was dead "as a result of asphyxiation." Now to call on Wright's surviving and dependent mother, as a part of her "affirmative case" for further "proof identifying to some reasonable degree the nature of the toxic gas" is to require the impossible, for, of course, the gas has long since dissipated into thin air. Gulf and Zephyr could have been in position to gather that proof, but Wright's mother never had any means of doing so. In any event, the conclusion is inescapable on the present record that hydrogen sulphide was in all probability the deadly gas.

Wright was a young man, only 22 years of age. His youth and inexperience must have been observable by Gulf's men on the job, and they must have known that like most other young men in these days, the early part of his manhood had been spent in military service, in his case in the Navy. Yet there is no evidence of a single word of warning to Wright of the deadly nature of this treacherous gas. Simpson, a more experienced employee, was rendered unconscious along with Wright, but revived.

Wright was Gulf's invitee, serving to further Gulf's business. Gulf owed him the duty to make and keep its premises reasonably safe for his use. When, as the work progressed, Gulf decided to drill an artesian water well rather than an oil well, and its drilling superintendent gave the order, in accordance with Gulf's reserved rights under the contract (footnote 3, majority opinion), to use the sulphur water as drilling fluid, Gulf owed a duty of reasonable diligence to see that that drilling fluid was reasonably safe. It knew that pumping drilling mud into the hole would have prevented further escape of the water and gas.[12] Whether

12. As testified by R. A. Spears, Gulf's drilling foreman,
"Q. Of course, had the drilling mud been prepared and pumped into the hole it would have been possible to kill the well by having mud of a sufficient weight to overcome the gas pressure and keep both the water and the gas in the hole, couldn't they? A. Yes, sir.

the decision of Gulf's drilling superintendent to follow the more dangerous course, made without any effort to find whether the hydrogen sulphide was present in dangerous and deadly concentration, was a negligent decision seems to me to be a question for the jury. Gulf owed to its obviously inexperienced invitee the duty to warn him of the danger of this deadly gas. It was for the jury to say whether that duty had been breached.

A thorough reading and study of the record convinces me that the issues were well understood by skillful trial counsel and were made entirely clear to the jury by the able and experienced trial judge. I think that the evidence was ample to sustain the jury's verdict. Indeed, it seems to me that no other just verdict could have been rendered.

My brother, with commendable industry and thoroughness, has collected, in the appendix to the majority opinion, a lengthy bibliography on the nature, the deadliness, and the treachery of hydrogen sulphide gas. William Wright had neither the capacity nor the leisure required for such an investigation. Indeed, the record discloses that my brothers now know much more about hydrogen sulphide gas, or rather about its literature, than did the oil field workers whose experience was measured by decades. With all deference to my brothers, and with sincere admiration for their learning, industry, and thoroughness, all of this simply proves to me the wisdom of leaving such questions of fact to be determined by twelve jurymen who can more nearly put themselves in the positions of the parties and thereby reach a common-sense, practical, and just conclusion. To my mind, the Seventh Amendment protects the sanctity of their verdict, and the judgment entered thereon should be affirmed.

I, therefore, respectfully dissent.

"Q. And that way the gas could not have come to the surface and this tragedy

could have been avoided, isn't that true, sir? A. That's right."